SUSAN M. CHEHARDY, Judge.
| ¡¡.This matter is on remand from the Louisiana Supreme Court. For the following reasons, we affirm defendant’s convictions and sentences.
After his first trial in 1998, defendant, Lawrence Jacobs, Jr., was convicted of first degree murder and sentenced to death. State v. Jacobs, 99-1659, p. 2 (La.6/29/01), 789 So.2d 1280, 1282-83. On direct appeal, the Louisiana Supreme Court reversed defendant’s conviction and sentence and remanded the matter for a new trial. Id.
In Jacobs I, the Louisiana Supreme Court reversed defendant’s conviction because of the trial judge’s erroneous denial of two of defendant’s challenges for cause. The supreme court described the denial of cause challenges as “the most blatant grounds” for reversal, but also noted serious questions regarding potential Batson violations and reminded the trial court “of its unique and integral role in the dynamics of voir dire and [cautioned] it to be especially sensitive to the alleged racially discriminatory use of peremptory challenges.” Jacobs I, supra at 1283, n. 2. The supreme court continued, citing State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, 502, and reiterated the importance of the trial judge’s role when Batson challenges are made:
The issue of purposeful racial discrimination in the use of peremptory challenges is a matter of utmost seriousness affecting not only the trial itself, but the perceived fairness of the judicial system as a whole. The trial judge observes first-hand the demeanor of the attorneys and venirepersons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold record.
Jacobs I, 789 So.2d at 1283, n. 2.
Justice Kimball, writing for the court, admonished the trial court to “properly address Batson challenges when made, by ruling on whether a prima facie ease of discriminatory intent has been made or by requiring race-neutral reasons for the strikes.” In closing, Justice Kimball reiterated that, “It is essential that the trial judge not only control the proceedings, but that he guide the attorneys through the necessary steps involved in a Batson challenge, in order to ensure the integrity and fairness of the jury selection process.”
On September 12, 2002, the Jefferson Parish grand jury indicted the defendant on one count of first degree murder, for the homicide of two victims. Defendant pled not guilty. On or about May 13, 2005, in response to the United States Supreme Court’s pronouncement in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005),[1] the Jefferson Parish District Attorney’s Office amended its indictment to reduce the charges against the defendant to two counts of second degree murder, in violation of La. R.S. 14:30.1, instead of one count of first degree murder.[2] Defendant was re-arraigned on the amended indictment and Lpled not guilty. *546 He filed numerous pre-trial motions before proceeding to his second trial on August 21, 2006.[3]
After a five-day trial, defendant was found guilty as charged by a unanimous twelve-person jury on August 25, 2006. On October 4, 2006, the trial court denied defendant’s motions for new trial and post verdict judgment of acquittal, and sentenced defendant to two consecutive life sentences at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant filed a motion to reconsider sentence, which was later denied.
In his timely-filed appeal to this Court, defendant challenged his convictions and sentences. On appeal, defendant asserted fifteen assignments of error, including:
racial discrimination infected jury selection; the trial court erroneously denied defense challenges for cause to impartial jurors; removal of counsel of choice is structural error; the trial court erred in admitting the gruesome autopsy ‘rod’ photographs because their prejudicial nature substantially outweighs their probative value; the admission of the stage offense had no independent relevance to this case; the trial court erroneously denied Appellant’s proposed instructions on leniency and the rights of the jury; there is insufficient evidence of second degree murder; the trial court’s exclusion of relevant evidence violated Lawrence Jacobs’ right to due process and a fair trial; appellant’s statements should have been suppressed; the State’s reliance on unreliable scientific evidence violates due process; defects in the Grand and Petit Jury pool violated the Constitution; the State failed to meet its heavy burden to establish that the case had not prescribed; the Grand Jury indictment failed to allege all necessary elements; the trial court erred in denying Appellant’s Motion to Quash La. C. Cr. P. Art. 782 as unconstitutional; consecutive life sentences for a Sixteen Year-Old offender convicted of second degree murder violates the Eighth Amendment; and, finally, the district court did not have proper jurisdiction over the case.
On May 5, 2008, both the defendant and the State argued before this Court. On May 8, 2008, defendant filed “Motion for Leave to File Attached Supplemental Assignment of Error and Post-Argument Brief.” On May 15, 2008, the State filed |,fits “Motion to File Post-Argument Supplemental Brief.” On May 19, 2008, this Court granted both parties leave to file supplemental briefs, which were filed that day.
In his supplemental brief, defendant raised two new assignments of error: (1) the appellate record is incomplete; and (2) the lack of a “properly endorsed” indictment is structural error. Defendant argues that the record contained the incorrect indictment, that the lack of a valid indictment deprives an appellate court of jurisdiction to review a case, and that an appellate record devoid of a valid indictment requires reversal of the conviction.
In its post-argument brief, the State noted that the record contained two (2) first degree murder indictments of defendant. The State further opined that the May 13, 2005 amendment to reduce the charges to second degree murder, which was inadvertently confected on the original 1996 indictment, did not form a basis for concluding reversible error as no prejudice existed concerning this matter.
Thereafter, on March 23, 2009, defendant filed a pro se “Motion for Leave to *547 File Attached Supplemental Assignment of Error and Post Argument Brief.” In this motion, defendant argued that his attorney filed a motion on May 8, 2008, to contest the use of the invalid indictment but the motion was withdrawn “due to the Courts saying they found the correct indictment.” Defendant argued that the indictment in the record was still incorrect. This Court granted defendant leave to file a supplemental brief.
On March 27, 2009, defendant filed a pro se supplemental appellant brief, raising two new assignments of error: (1) trial court erred in proceeding with the trial when no valid indictment had been filed; and (2) there is no “codal authorization for the prosecutor to amend an indictment; The judge in duty must |finot create and exercise functions of the legislature, but only to interpret law, as binding on him by the Constitution and 1974 Louisiana Constitution Art. I & 15.”
Defendant argued that he was arraigned, tried, convicted, and sentenced on a non-existent charge of second degree murder because an oral indictment is no indictment at all. He concluded that this error patent requires a reversal of his conviction. He further argued that the State did not have the authority to amend the indictment and to institute prosecution of second degree murder with a bill of information.
On May 12, 2009, “after profound scrutiny, we found serious merit in defendant’s claim that the prosecution’s exercise of peremptory challenges reflected purposeful racial discrimination, which were not properly addressed by the trial court when the defendant objected during voir dire. Accordingly, we vacated defendant’s convictions and sentences and granted a new trial.”[4] In doing so, this Court pretermit-ted discussion of the remaining assignments of error, including errors patent.
On April 5, 2010, the Louisiana Supreme Court granted writs. By per curiam,[5] the Louisiana Supreme Court reversed this Court’s decision as it found no error in the trial court’s acceptance of the prosecutor’s reasons for its peremptory challenges, Jacobs III, 09-1304 at 5, 7-9, 32 So.3d at 231, 232-33, and nothing in the totality of the voir dire of these prospective jurors that rose to the level of Batson violations. Jacobs III, 09-1304 at 9-13, 32 So.3d at 233-36.
The Louisiana Supreme Court, in addressing defendant’s claim of disparate questioning, conceded that the prosecutor’s questions to the last panel of | ./predominantly white prospective jurors were “compressed” but found the dissimilar treatment was insignificant:
Taking into account that voir dire was almost completed, that only a few jury members, or alternates, needed to be selected, and that these remaining veni-repersons sat through the questioning of the prior three panels, the fact that the prosecutor may have compressed his questioning near the end of voir dire is far different than if disparate questioning occurred between the first and second panels, had there been all white prospective jurors in one and non-white prospective jurors in the other. When examined, the factor of disparate questioning loses the significance given to it by the court of appeal.
Jacobs III, 09-1304 at 13-14, 32 So.3d at 236. The supreme court also found that this Court’s citation of “bare statistics” *548 regarding the number of non-white jurors struck by the prosecution was not an appropriate gauge of racially-discriminatory intent. Jacobs III, 09-1304 at 14-15, 32 So.3d at 236-37.
Most importantly, the Louisiana Supreme Court retroactively applied the reasoning of Thaler v. Haynes[6] to reverse this Court’s “imposed requirement” that the trial judge articulate on the record that the trial judge both observed and remembered the demeanor-based explanations given by the prosecutor as race-neutral reasons for the peremptory challenges. Jacobs III, 09-1304 at 9, 32 So.3d at 233. Finally, the supreme court remanded the matter to this Court “for its consideration of the other issues raised by the defendant on appeal.” Jacobs III, 09-1304 at 15, 32 So.3d at 237.[7]
On June 18, 2010, the Louisiana Supreme Court granted rehearing in part in State v. Jacobs III, 09-1304 (La.6/18/10), 37 So.3d 994 (per curiam)
|sto clarify that the matter is remanded to the court of appeal for ... consideration of other issues raised ..., but pretermitted in the appellate court’s original analysis, including other Batson issues not previously addressed by the court of appeal or ruled on by this Court in its per curiam opinion.
Jacobs III, 09-1304 at 1, 37 So.3d at 995. The supreme court otherwise denied rehearing, finding no merit to the defendant’s argument that two of the Justices signing the four-Justice per curiam opinion should have been recused. Jacobs III, 09-1304 at 1, 37 So.3d at 995 (on rehearing).[8]
On July 23, 2010, this Court granted defendant’s request to file a supplemental brief. In addition, this .Court allowed the State time to file a brief, if desired. On August 30, 2010, defendant, through counsel, filed a “Supplemental Brief.” In this brief,
Mr. Jacobs re-urges each of the Assignments of Error issued in his original brief, his supplemental brief filed with leave of court, the pro se brief filed in this Court and the pro se Motion to Quash filed in the district court, along with the arguments articulated to the Louisiana Supreme Court in opposition to the Writs, and in his request for rehearing at that Court.
He also assigned as error that “Appellant’s State and Federal Rights to a Grand Jury Indictment Free of Discrimination Were Violated in That He Was Either Tried Pursuant to an Indictment Infected by Race and Gender Discrimination or Prosecuted on a Null Indictment, or the Verdict in This Case Was Non-Responsive to the Indictment.”
*549 Defendant concedes that this argument was not raised in the original brief, but advised that it was raised by appellant in both pro se supplemental briefs and a counseled brief filed with this Court. Defendant also provided that this Court acknowledged this problematic issue in a footnote in Jacobs II. Defendant further asserted that, unlike its first review, this Court now has a transcript of the reading |flof the indictment, which plainly reflects that the State proceeded to trial on the 1996 indictment.
Defendant claims the State proceeded to trial on an indictment that may have been fatally undermined by an unresolved claim of racial discrimination. Alternatively, he argues that he was prosecuted based upon a null indictment because the 1996 indictment was rendered null and void by the issuance of the 2002 indictment.
Additionally, in this supplemental brief, defendant explained that after this Court’s reversal, defendant pro se filed a motion to quash the proceedings in the district court but that motion has not been heard. Defendant requested that this Court remand the matter to the district court to determine the validity of the indictment.
On September 1, 2010, this Court granted defendant’s motion to supplement the record with the August 23, 2006 transcript of the reading of the indictment. The record was supplemented on September 14, 2010.
On September 20, 2010, the State filed its supplemental appellee brief. The State contends that the supreme court remanded this matter for this Court to consider only those issues raised by defendant on appeal and pretermitted in this Court’s original analysis. First, although the State concedes that defendant did argue in his original appellate brief that he was indicted by an illegally constituted grand jury because African-Americans were underrepresented in the venire, the State asserts that defendant did not allege or timely brief the arguments of a null indictment or non-responsive verdict, and, therefore, these two issues are beyond the Supreme Court’s remand order and should not be considered by this Court.
Second, the State points out that these two new issues were not raised in the trial court because there was no objection below and there is no ruling to review. | inThird, the State notes that, even if defendant filed a pro se Motion to Quash, the district court did not have authority to rule on that motion while the matter was on appeal.
Fourth, even if this Court could reach the merits of these issues, it would find no error because the amended indictment gave fair notice and set forth identifiable offenses. Moreover, the verdicts were based on the evidence and the list of responsive verdicts was correct and in accordance with the law. Finally, even if the Court found error, defendant could not establish that he was prejudiced because he knew the indictment had been or would be amended to second degree murder and, as such, any such error would be harmless.
On October 25, 2010, defendant filed his second pro se supplemental brief.[9] Defendant raised two assigned errors in this brief: (1) Appellant’s State and Federal Rights to a Grand Jury Indictment were violated in that he was tried on an indictment that was null and void, and no indictment at all; and (2) Consecutive Life Sentences for a Sixteen Year Old Offender Convicted of Second Degree Murder Violates the Eight [sic] Amendment.
*550 Defendant argued that the jury was sworn and charged pursuant to the superseded 1996 indictment and that when the State filed the 2002 indictment it rendered the 1996 indictment and all related proceedings null and void. Defendant also argued that his life sentence without parole was an absolute nullity because it “unconstitutionally legislates an unguided mandatory civil death, imposed under prohibited judicial discretion.” Defendant also seems to argue that Louisiana’s sentencing statute was unconstitutional under the U.S. Constitution and the Louisiana Constitution due to the lack of judicial discretion and alternative punishment.
In On November 29, 2010, defendant, through counsel, filed his “Response to State’s Supplemental Brief.” In his response, counsel argued that the State’s assertion that the 1996 indictment was implicitly dismissed rendered the 2006 prosecution void entirely and that, contrary to the State’s assertions, the issue before this Court was not one of formal or technical insufficiency of the 2002 indictment. Defendant also denied having access to the indictment as suggested by the State. Defendant further responded that the errors in question constituted patent and structural error, not harmless error as suggested by the State. Defendant argued that proceeding to trial on a void indictment, and an “extra” second degree murder conviction and life sentence, could not be considered harmless.
It is in this procedural posture that we consider defendant’s convictions and sentences on appeal. In the interest of judicial economy, we adopt the Louisiana Supreme Court’s recitation of the facts of this case, as follows:
On the morning of October 31, 1996, forty-five-year-old Nelson Beaugh and his seventy-year-old mother, Della Beaugh, were fatally shot in Nelson’s home in Marrero, Louisiana. Nelson’s mother-in-law discovered their bodies when she arrived to clean the house that same morning. Both victims had been shot in the head.
An investigation led to the issuance of an arrest warrant for the defendant, Lawrence J. Jacobs, Jr., who was sixteen years old at the time.... When the police contacted the defendant’s father, Lawrence Jacobs, Sr., Mr. Jacobs notified the case agent, Lieutenant Snow, that his son had run away from home two months earlier, but that he would assist in locating him. Thereafter, Mr. Jacobs discovered that the defendant had fled to Jackson, Mississippi, where they had relatives. Mr. Jacobs picked his son up in Jackson, drove him back to Louisiana, and surrendered him to Lt. Snow.
State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280, 1282.
In his seventh assignment of error, defendant argues that the State failed to present sufficient evidence to convict him of second degree murder. When issues are raised on appeal as to sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. 112When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issues regarding trial errors become moot. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Guillard, 04-899 (La.App. 5 Cir. 4/26/05), 902 So.2d 1061, 1070, writ denied, 05-1381 (La.1/13/06), 920 So.2d 233.
Specifically, defendant argues that the State failed to exclude the reasonable hypothesis that he was guilty of manslaughter. Defendant contends that the State’s *551 evidence showed that he had terminated his involvement in the burglary and had begun to flee when his co-defendant shot and killed the victims. Defendant argues that his statement indicated he participated in an unarmed burglary, and that the State failed to present evidence to establish that his gun was operable.
The State responds that the evidence presented supports defendant’s second degree murder conviction. The State contends that the evidence clearly showed that defendant was engaged in the commission of an aggravated burglary and an armed robbery, which resulted in two homicides.
The appropriate standard of review for determining the sufficiency of the evidence was established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to Jackson, supra at 319, 99 S.Ct. 2781, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See also State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Holmes, 98-490, p. 3 (La.App. 5 Cir. 3/10/99), 735 So.2d 687, 690.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of | lathe main fact can be inferred according to reason and common experience. State v. Williams, 05-59, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833.
When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that “ ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Wooten, 99-181, p. 4 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 at 4-5, 738 So.2d at 675.
Second degree murder is defined as the killing of a human being when the offender: (1) has specific intent to kill or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including aggravated burglary and armed robbery, even though he has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A). See also State v. Kirkland, 01-425, p. 6 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 268, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415.
La. R.S. 14:60 defines aggravated burglary, in pertinent part, as the unauthorized entering of any inhabited dwelling, with the intent to commit a felony or any theft therein, if the offender is armed with a dangerous weapon. Principals are defined as all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. La. R.S. 14:24. See also State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1224 (per curiam). Only those persons who “knowingly participate in the planning or execution of a crime” are principals to that crime. State v. Pierre, 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428 (per cu- *552 riam). Mere presence at the scene of a crime does not make one a principal to the crime. Id.
In this case, defendant argues that he participated in an unarmed burglary because he was carrying a broken gun. First, it is immaterial whether defendant’s gun was unloaded or inoperable.[10] La. R.S. 14:2(A)(3) defines dangerous weapons to include: “any gas, liquid, or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.”
In State v. Lewis, 39,263, p. 6 (La.App. 2 Cir. 1/26/05), 892 So.2d 702, 706, the Louisiana Second Circuit recognized that jurisprudence has:
long held that unworkable or unloaded guns can constitute dangerous weapons when used in a manner likely to produce death or great bodily harm. The likelihood of this serious harm can come from the threat perceived by victims and bystanders. The highly charged atmosphere of a pistol robbery is conducive to violence regardless of whether the pistol is loaded or workable because the danger created invites rescue and self-help.
In State v. Washington, this Court recognized the following:
[a] toy gun has been held to be a dangerous weapon for purposes of an armed robbery conviction if the jury finds that “the interaction between the offender and the victim created a highly charged atmosphere whereby there was a danger of serious bodily harm resulting from the victim’s fear for his life.”
00-1312, p. 6 (La.App. 5 Cir. 5/16/01), 788 So.2d 596, 601, writ denied, 01-1718 (La.5/3/02), 815 So.2d 94.
Here, defendant himself admitted that he entered the house with a gun and removed property from the victims. Defendant stated that he told the female | lavictim to go into the living room then loaded the van with items taken from the residence. We find that the evidence supports a finding that defendant committed both aggravated burglary and armed robbery.
Next, defendant argues that, at most, he was guilty of manslaughter[11] based on the underlying crimes of accessory after the fact or burglary of an inhabited dwelling.[12] However, under general principles of accessorial liability, all parties to a crime are guilty for the deviations from the common plan, which are the foreseeable consequences of carrying out the plan. State v. McFarland, 07-26, p. 9 (La.App. 5 Cir. 5/29/07), 960 So.2d 1142, 1147, writ denied, 07-1463 (La.1/7/08), 973 So.2d 731 (citing State v. Smith, 98-2078, *553 p. 7 (La.10/29/99), 748 So.2d 1139, 1143).[13] The risk that an unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary, which every party to the offense must accept no matter what he or she actually intended. Id. at 1147-48.
The Louisiana Supreme Court has observed the following:
[b]urglary laws are not designed primarily to protect the inhabitant from unlawful trespass and/or the intended crime, but to forestall the germination of a situation dangerous to the personal safety of the occupants....
In the archetypal burglary an occupant of a dwelling is startled by an intruder who may inflict serious harm on the occupant in his attempt to commit the crime or to escape from the house. The frightened occupant, not knowing whether the intruder is bent on murder, theft, or rape, may in panic or anger react violently, causing the burglar to retaliate with deadly force.
h State v. McFarland, 07-26 at 9-10, 960 So.2d at 1148 (quoting State v. Lozier, 375 So.2d 1333, 1337 (La.1979)).
Even if defendant only intended to rob the victims, as he claimed in his statement, this would not absolve him from responsibility, since the risk that the unauthorized entry of an inhabited dwelling could escalate into violence and death was a foreseeable consequence of burglary, which every party to the offense must accept no matter what was actually intended. See State v. McFarland, 07-26 at 10, 960 So.2d at 1148; See also, State v. Smith, 07-2028, p. 8 (La.10/20/09), 23 So.3d 291, 296 (per curium ) (a simple burglary may turn into an aggravated burglary and then escalate further into a second degree felony murder, well beyond the original plan of the defendant or his accomplice who then unexpectedly kills during the commission of the underlying felony offense).
Furthermore, at trial, defendant stated that he knew what was going to happen after Bridgewater’s comment that the victims would not be calling the police. Instead of doing something to prevent the homicides, defendant ran outside. Instead of rendering assistance after the victims were shot, he left with Bridgewater in the victim’s van, which defendant had loaded with items taken from the residence. After disposing of the van, they went to Canal Street. Instead of reporting the shootings, defendant fled to Mississippi.
In numerous cases, this Court has found sufficient evidence to support a second degree murder conviction against a defendant who may not have pulled the trigger. In State v. Hill, 98-1087, pp. 9-10 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 696-97, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, this Court upheld the defendant’s second degree murder conviction, even though the trial testimony indicated the defendant was probably not the shooter. This Court pointed out that the defendant was at the murder scene with knowledge that his co-defendant | nplanned to rob the victim; that the defendant did nothing to prevent the crime; and that the defendant fled the scene instead of coming to the victim’s aid after the shooting.
Even more recently, in State v. Page, 08-531, pp. 10-11 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449-50, writ denied, 09-2684 (La.6/4/10), 38 So.3d 299, this Court found sufficient evidence of second degree murder where the defendant remained with the co-defendant at the scene, did nothing *554 to prevent the crime, fled the scene rather than coming to the victim’s aid after the shooting, and did not attempt to report the shooting.
Because defendant knowingly participated in the execution of the crime, i.e. aggravated burglary, during which two people were killed, we find that he is a principal to the resulting crime, i.e., second degree murder, even if he did not fire the fatal shots. Thus, after viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of second degree murder for the homicides of Della Beaugh and Nelson Beaugh. Accordingly, this assignment of error lacks merit.
Returning now to defendant’s first assignment of error, he argues that racial discrimination infected jury selection. Specifically, defendant argues that the trial court erred in denying his Batson[14] challenge after the State used six of seven peremptory challenges in the second jury panel to strike five African-American 118and one Hispanic prospective jurors and its only peremptory challenge in the third jury panel to strike another prospective African-American juror.[15]
Defendant contends (1) the statistical evidence of racial discrimination, (2) the overall historical evidence of racial discrimination in jury selection in Jefferson Parish,[16] (3) the prosecution’s disparate questioning of African-American and white jurors, (4) the prosecution’s failure to conduct meaningful voir dire on matters that were of alleged concern and which formed the basis for its peremptory strikes, and (5) the prosecution’s failure to strike white jurors who offered similar responses, sufficiently supported his Batson claim. Defendant also asserts the trial court merely rubber-stamped the race-neutral explanations given by the State and failed to conduct the analysis required to determine whether the offered explanations were pretextual to purposeful discrimination.
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson, the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of a prospective juror were based on race.
First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the *555 basis of race. Batson, 476 U.S. at 96-97, 106 S.Ct. at 1723. When the trial judge does not rule on whether a defendant asserting a Batson challenge met his burden to establish a prima fade case of racial discrimination, but rules on the ultimate question of intentional discrimination after the State offers a race-neutral explanation for the peremptory challenge, the issue of whether the defendant made a prima fade showing becomes moot. State v. Coleman, 06-518, p. 4 (La.11/2/07), 970 So.2d 511, 514 (citing Hernandez v. New York, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)); State v. Taylor, 06-558, p. 21 (La.App. 5 Cir. 7/30/07), 966 So.2d 631, 644, writ denied, 07-1902 (La.2/1/08), 976 So.2d 717.
Second, if the prime fade showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723-24. This second step “does not demand an explanation that is persuasive or even plausible;” as long as the reason is not inherently discriminatory, it suffices. Burkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam).
Third, the trial court must then determine whether the defendant has established purposeful discrimination. Batson, 476 U.S. at 98, 106 S.Ct. at 1724. It is at this third step that implausible explanations offered by the prosecution “may (and probably will) be found to be pretexts for purposeful discrimination.” Purkett v. Elem, 514 U.S. at 768, 115 S.Ct. at 1771. “[A] trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.” Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008) (citing Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)).
A single strike based upon race supports a Batson claim and requires reversal no matter how ably the prosecution has defended the other strikes. State v. Elie, 05-1569, p. 7 (La.7/10/06), 936 So.2d 791, 796 (citing Batson, 476 U.S. at 95, 106 S.Ct. at 1722). The Supreme Court subsequently. affirmed and applied the three-part Batson test in Miller-El v. Dretke, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005), in Snyder v. Louisiana, supra, and, in Thaler v. Haynes, 559 U.S. —, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010). In Miller-El, the Supreme Court emphasized the trial judge’s responsibility to assess the plausibility of the prosecutor’s proffered race-neutral reason “in light of all evidence with a bearing on it.” Miller-El, 545 U.S. at 252, 125 S.Ct. at 2331. The Supreme Court further stated:
A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.
Miller-El, 545 U.S. at 252, 125 S.Ct. at 2332.
Subsequently, in Snyder v. Louisiana, supra, the Supreme Court again emphasized that the plausibility of the prosecutor’s explanation for a peremptory strike is to be carefully scrutinized by the trial judge under the third step of the Batson inquiry, and noted that implausible reasons will fail a Batson challenge. In discussing the third step of the Batson inquiry in Snyder, the Supreme Court stressed the trial judge’s pivotal role in determining the plausibility of the State’s race-neutral explanation. The Supreme Court explained that the third step requires the trial court *556 to evaluate the prosecutor’s credibility by assessing “not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demean- or can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.” Snyder, supra at 1208.
Referencing its earlier decision in Miller-El v. Dretke, the Supreme Court again stressed that “all of the circumstances that bear upon the issue of racial animosity must be consulted” in determining whether the explanation given for the strike is convincingly race-neutral. Id. When the record does not support the prosecutor’s proffered explanation or shows the proffered explanation to be implausible, there is an inference of discriminatory intent that sufficiently demonstrates a Batson violation. Id. at 1212.
In Snyder, the Supreme Court recognized the trial judge’s great discretion in evaluating discriminatory intent in a Bat-son challenge. Id. at 1208. The Snyder court acknowledged the importance of the trial judge’s first-hand observations of a juror’s demeanor noting that his observations often form the basis for race-neutral reasons for peremptory challenges. Id. The Supreme Court further stated, “‘in the absence of exceptional circumstances, [it] would defer to the [trial court].’ ” Id.
In Thaler, supra, the United States Supreme Court considered the question of whether any decision of the Supreme Court “clearly establishes” that a judge, in ruling on an objection to a peremptory challenge under Batson, must reject a demeanor-based explanation for the challenge unless the judge personally observed and recalls the aspect of the prospective juror’s demeanor on which the explanation is based. Id. at 1172. The Supreme Court in Thaler found that, although it appeared that the Court of Appeals concluded that either Batson or Snyder clearly established such a rule, it believed the Court of Appeals read far too much into those decisions and its holding, if allowed to stand, would have important implications. As such, the Supreme Court granted the petition for certiorari and reversed the judgment of the Court of Appeals. Id.
The Supreme Court in Thaler determined that neither Batson nor Snyder held that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror’s demeanor. Id. at 1174. In reversing the judgment of the Court of Appeals, the Supreme Court held that no decision of the United States Supreme Court clearly established the categorical rule on which the Court of Appeals relied. Id. at 1175.
In this case, defendant contends that the trial court erred in denying his Batson challenge as to each of the seven non-white prospective jurors excluded by the prosecution’s peremptory strikes. However, as noted above, we will only address the Batson challenge as to the two prospective jurors, Viola Hawkins and Tempy Dillon, that neither this Court nor the Louisiana Supreme Court has discussed.[17]

Prospective Juror Viola Hawkins

The record shows the prosecutor explained that he used a peremptory challenge to strike Ms. Hawkins because she wanted the defendant to testify and prove his innocence. He maintained that she was outside of a challenge for cause on the *557 issue because she was somewhat rehabilitated during defense counsel’s voir dire.[18]
Defense counsel responded that many jurors indicated they wanted defendant to testify and were not stricken by the prosecutor. She referred to white panelists John Arnold and Nick Vinturella, both of whom allegedly expressed similar desires for defendant to testify but were, nonetheless, accepted by the State. Defense counsel noted that Mr. Vinturella’s view, that the defendant’s failure to testify would be in the “back of his mind,” was far more disconcerting than Ms. | ^Hawkins’ response that she would not hold defendant’s failure to testify against him.[19]
The trial judge denied the Batson challenge and remarked, “Mr. Vinturella said [he] presumed that the defendant was innocent until we hear the evidence and the testimony. I think it’s distinguished.” He made no comment regarding a comparison with Mr. Arnold.[20]
Upon review, we note that, during the prosecutor’s voir dire, Ms. Hawkins stated that she would want defendant to testify to prove his innocence and that the prosecutor could say nothing to change her mind on that issue. When defense counsel reached Ms. Hawkins, the trial judge, at a side bar conference, opined Ms. Hawkins was not going to be on the jury because she indicated she would hold defendant’s failure to testify against him. Defense counsel asked for an opportunity to rehabilitate her. In response to defense counsel’s questions, Ms. Hawkins implied that she would not hold defendant’s failure to testify against him but still reiterated that she believed a defendant should testify.
Clearly, the trial judge concluded that the State’s reason for its challenge to Mrs. Hawkins was race-neutral. We find no error in the trial judge’s ruling.

Prospective Juror Tempy Dillon

Ms. Dillon was a member of the third jury panel and was the last peremptory strike exercised by the State. The State struck Ms. Dillon because she was too sympathetic to runaway teenagers, like the defendant.
During voir dire, defense counsel sought to elicit the views and opinions of the prospective jurors regarding teenagers, teenagers’ ability to make decisions, l^and the effect of peer pressure. Amidst a discussion about raising responsible teenagers, Ms. Dillon stated, “[a]s far as I can see my kids are good kids. I never had a problem with them, but others you just can’t say. You can only speak for what you know your kids does [sic]. Others you just can’t say.” When defense counsel asked Ms. Dillon what she would worry about if one of her children ran away, she indicated that she would worry about her child getting hurt.
The prosecutor’s proffered explanation for striking Ms. Dillon was that he found her voir dire responses demonstrated she had “a proclivity, an inclination, a little bit of a motivation to side with the defense *558 during the case.” He explained he did not like Ms. Dillon’s response to defense counsel’s voir dire when she indicated that “if the kid ran away the problem that she would have is that the kid would get hurt.”
The trial judge found the State had presented a sufficiently race-neutral reason, denied the Batson challenge, and commented that Ms. Dillon said, “she could only speak on her own kids and she worried about them getting hurt out there and some kids are more susceptible to being led by the wrong crowd.” Acknowledging Ms. Dillon’s concern was limited to her own children, the trial judge accepted the proffered explanation as race-neutral.
In determining whether a Batson violation has occurred, the focus is on the intent of the prosecutor. Snyder v. Louisiana, supra. The trial judge found no discriminatory intent. Based on the foregoing, we find no error in the trial judge’s rulings.
In defendant’s second assignment of error, he argues that the trial court erroneously denied defense challenges for cause to impartial jurors. Specifically, defendant contends the trial court erred in denying his challenges for cause of four 12spotential jurors: John Knight, Carol Thouron, Nick Vinturella, and William Montgomery.[21]
First, defendant asserts that Mr. Knight should have been excused for cause because he was a member of a racial group that actively promoted a race-based separatist agenda. Second, he argues Ms. Thouron should have been excused because she and her husband were victims of a burglary similar to the charged offense and,.thus, could not be an impartial juror. Third, defendant maintains Mr. Vinturella and Mr. Montgomery should have been excused because they expressed concerns about defendant’s failure to testify and his presumption of innocence. Defendant asserts he exhausted his peremptory challenges and, therefore, prejudice is presumed and reversal is warranted by the trial court’s erroneous denial of his challenges for cause.[22]
La.C.Cr.P. art. 797, subsections (2) and (4), provide that a defendant may challenge a juror for cause on the following pertinent grounds:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence; [or]
(4) The juror will not accept the law as given to him by the court[.]
The party seeking to exclude a juror for cause has the burden to demonstrate, through questioning, that the juror lacks impartiality. State v. Taylor, 99-1311, p. 13 (La.1/17/01), 781 So.2d 1205, 1218, cert. denied, 534 U.S. 844, 122 S.Ct. 106, 151 L.Ed.2d 64 (2001). A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied.
*559 However, a challenge for cause is not warranted when a prospective juror has voiced an opinion seemingly prejudicial to the defense, but after further inquiry (frequently referred to as “rehabilitation”) the juror demonstrates the ability and willingness to decide the case impartially according to the law and evidence. State v. Smith, 05-951, pp. 8-9 (La.App. 5 Cir. 6/28/06), 934 So.2d 269, 275, writ denied, 06-2930 (La.9/28/07), 964 So.2d 357 (citing State v. Anthony, 98-406, pp. 22-23 (La.4/11/00), 776 So.2d 376, 391, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000)).
A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. La.C.Cr.P. art. 800(A). Prejudice is presumed and a reversal is warranted when a challenge for cause is erroneously denied by the trial court and the defendant has exhausted his peremptory challenges. State v. Lindsey, 06-255, p. 2 (La.1/17/07), 948 So.2d 105, 107.
A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. State v. Mickel, 07-47, p. 9 (La.App. 5 Cir. 5/29/07), 961 So.2d 516, 522, writ denied, 07-1422 (La.1/7/08), 973 So.2d 732. For the reason that the trial court “has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning,” whereas the reviewing court reviews the matter only on a transcript in a record. State v. Anthony, 98-406 at 25, 776 So.2d at 392. Thus, a trial judge’s ruling on a challenge for cause will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Mickel, supra.
li>7In the present case, defendant exhausted all of his peremptory challenges and, therefore, the only issue is whether the trial court erroneously denied defendant’s challenges for cause as to each of the four prospective jurors.

Prospective Juror John Knight

Defendant contends Mr. Knight should have been excused for cause for partiality. Defendant claims that Knight is partial since he was a member of the Sons of Confederate Veterans, he characterized the NAACP as a radical “click,” and he stated he wanted to be excused to preserve the integrity of a conviction.
During voir dire, Mr. Knight approached the bench to inform the trial judge and parties that he was a member of the Sons of Confederate Veterans group. He explained that the organization’s purpose is to preserve and honor the lineage of confederate veterans. When asked why he felt compelled to bring this information to the trial court’s attention, he responded that defendant was “African-American.” Mr. Knight explained that some people perceive the organization as a racist group, although he did not believe it to be a legitimate perception. He further stated he “didn’t want anything overturned after the fact because of something like that.”
Defense counsel further questioned Mr. Knight about the organization and his membership. Mr. Knight stated he has been a member of the group for eight years and has attended a little more than half of the monthly meetings. He explained that the only requirement for membership in the group is to have an ancestor who fought for the confederacy. He stated that the organization has African-American members and does not exclude membership on the basis of race.
When defense counsel asked what values the organization promotes, Mr. Knight explained there are two elements of the group: re-enactments and political action. *560 He explained the political action included preservation of the confederate flag even though that flag is not a symbol of the Sons of Confederate Veterans. He |2«noted that the confederate flag has been used in racist settings, which sometimes presents a problem for those associated with the flag.
Mr. Knight admitted he joined the Sons of Confederate Veterans primarily because of the controversy in South Carolina over the display of the confederate flag. He explained he disagreed with the manner in which the removal of the flag was sought; specifically, the way the NAACP, to which Mr. Knight referred as “a click,” tried to change things that “had been done for years and years and years.”
Mr. Knight noted the NAACP viewed the confederate flag, in any form, as a racist symbol, a perception to which Mr. Knight expressly stated he did not subscribe. Mr. Knight further noted that just because the flag is perceived by some as a racist symbol, does not make the perception right. Thereafter, Mr. Knight rejoined the jury panel and voir dire continued.
Defendant subsequently challenged Mr. Knight for cause claiming that he could not be impartial because he was a member of the Sons of Confederate Veterans and the defendant was African-American. Defendant’s challenge for cause was based on a presumed bias of members of the Sons of Confederate Veterans against any African-American defendant.
Mere membership in or affiliation with an organization is not a ground for a challenge for cause where the voir dire as a whole shows the juror can render an impartial verdict according to the law and evidence. State v. Manning, 03-1982, p. 32 (La.10/19/04), 885 So.2d 1044, 1078-79, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); State v. Isaac, 261 La. 487, 260 So.2d 302, 304 (La.1972); State v. Dunn, 161 La. 532, 109 So. 56, 62 (La.1926), cert. denied, 273 U.S. 656, 47 S.Ct. 344, 71 L.Ed. 825, 273 U.S. 744 (1927) (per curiam ).[23]
Unless it appears the prospective juror’s affiliation causes him to be biased or prejudiced against the defendant, there is no error in the trial court’s refusal to grant a challenge for cause on the basis of the affiliation. State v. Dunn, supra (prospective jurors’ membership in the Ku Klux Klan was not grounds for challenges for cause because the prospective jurors indicated their membership would not influence their verdict). See also, State v. Square, 257 La. 743, 244 So.2d 200, 229 (1971), vacated in part by Square v. Louisiana, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972) (prospective juror’s past association with the Ku Klux Klan did not form a basis for a challenge for cause where he stated his prior association with the organization would not interfere with his impartial judgment in the case); Person v. Miller, 854 F.2d 656, 665 (4th Cir.1988), cert. denied, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989) (no error in the trial court’s denial of a challenge for cause where a prospective juror was a member of the NAACP and the defendant was a member of a white supremacist group, noting the juror’s repeated assertions that he was able to render a fair and impartial verdict). Here, the trial judge *561 denied defendant’s cause challenge of Mr. Knight. Because affiliation with an organization alone cannot support a challenge for cause, we find no error in the trial court’s ruling.

Prospective Juror Carol Thouron

Defendant asserts Ms. Thouron should have been excused for cause because she and her husband were victims of a home burglary, which was similar to the charged offense. He maintains that, although Ms. Thouron indicated she could be 1 aoimpartial, she hesitated in her response. He contends her mere protestation of impartiality was insufficient to overcome a reasonable inference of bias.
During voir dire, Ms. Thouron stated she had been the victim of a home burglary 15 years ago. She explained that someone broke into her home at night and threatened to kill her and her husband. Ms. Thouron stated that she pulled a gun on the perpetrator and he fled. She admitted the present case was “a little similar” to her experience. When asked whether her experience would affect her, she stated she did not know because she had yet to learn the circumstances of the case. Defense counsel nonetheless attempted to explore the effect of Ms. Thouron’s experience on her ability to remain impartial. Ms. Thouron stated she did not understand defense counsel’s question, but stated she thought she could be impartial.
Defense counsel later challenged Ms. Thouron for cause, claiming that she could not be impartial because of her experience as a victim of a burglary, which was similar to the charged offense. Defense counsel argued Ms. Thouron was hesitant in her response that she could be impartial. The State responded that Ms. Thouron was straightforward and had no hesitancy in voicing her ability to be fair. The trial judge agreed and denied the challenge for cause.
The fact a juror has been the victim of a crime, even one that is similar to the one with which the defendant is charged, does not necessarily preclude that juror from serving on a jury as long as the juror’s partiality has been unaffected. State v. Robinson, 36,147, p. 11 (La.App. 2 Cir. 12/11/02), 833 So.2d 1207, 1214. As previously stated, the trial judge has the benefit of observing potential jurors in person to assess the facial expressions and voice intonations as they answer questions and, thus, his determination is afforded great discretion. State v. Anthony, 98-406, p. 25 (La.4/11/00), 776 So.2d 376, 392, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000); State v. Mickel, 07-47, p. 9 (La.App. 5 Cir. 5/29/07), 961 So.2d 516, 522, writ denied, 07-1422 (La.1/7/08), 973 So.2d 732.
In the present case, the trial judge observed Ms. Thouron’s demeanor and was satisfied she could be a fair and impartial juror.[24] The record does not indicate he abused his discretion. Thus, we find no error in the trial court’s denial of defendant’s challenge for cause as to Ms. Thour-on.

Prospective Juror Nick Vinturella

Defendant contends Mr. Vinturel-la should have been excused for cause because he stated defendant’s failure to testify would be in the “back of his mind.” Early during voir dire, the State explained defendant’s right against self-incrimination *562 and that jurors could not censure defendant if he chose not to testify. The State also explained that it bore the burden of proof. When the prosecutor subsequently asked if any of the prospective jurors would still want defendant to testify, one juror replied affirmatively but the rest of the panel, including Mr. Vinturella, collectively indicated that they did not need defendant to testify.[25]
Defense counsel also explained the presumption of innocence during voir dire. She asked Mr. Vinturella if he believed defendant was probably guilty of something simply because defendant had been arrested and indicted. Mr. Vinturella responded that there had to be some evidence against defendant for the State to prosecute.
Defense counsel then asked if Mr. Vintu-rella would be “looking for something from the defendant to show ... he’s innocent.” Mr. Vinturella | .^responded “no, not really,” and explained he would just be looking to hear all the evidence against defendant. Defense counsel continued and asked what his verdict would be if he had to render one “right now.” Mr. Vinturella responded he could not render a verdict because he had not heard the evidence. He explained he presumes defendant is innocent until he hears the evidence.
Mr. Vinturella admitted that the failure of defendant to testify would remain in the back of his mind. He stated he did not think it was humanly possible for anyone to be able to completely block out of his mind the fact that defendant did not testify. He reiterated, however, that he would listen to all the evidence then make a determination about defendant’s guilt or innocence.
Defense counsel subsequently challenged Mr. Vinturella for cause on the basis that defendant’s failure to testify would be in the “back of his mind.” The trial judge denied the challenge noting Mr. Vinturella stated he could follow the law.
In State v. Abney, 347 So.2d 498, 501 (La.1977), the Louisiana Supreme Court found no error in the trial court’s denial of a challenge for cause of a prospective juror who stated he found it difficult to put the defendant’s failure to testify “totally out of [his] mind.” The supreme court noted that, when the trial judge further interrogated the juror after his response, the juror stated he could accept and comply with the instruction that a defendant’s failure to testify in his defense does not give rise to a presumption of guilt. The supreme court concluded that the trial court did not err in “deeming the witness impartial ... when, upon the court’s further inquiry, the juror unequivocally demonstrated a willingness to decide the case on the evidence presented in accordance with the instructions as to law given the jury by the trial judge.” Id.
|33In State v. Bush, 02-247, p. 10 (La.App. 5 Cir. 6/26/02), 822 So.2d 859, 866-67, writ denied, 02-1887 (La.1/24/03), 836 So.2d 42, this Court found no error in the denial of a challenge for cause of a prospective juror who admitted that the defendant’s choice not to testify might “creep into her mind.” This Court noted that no further questions were asked of the juror after her seemingly prejudicial statement.
While this Court recognized the record was not replete with efforts to rehabilitate the challenged juror’s possible inability to keep a defendant’s choice not to testify from “creeping into her mind,” it concluded that the record was not devoid of ef *563 forts to instruct her on that point. This Court focused on the trial judge’s instructions at the beginning of voir dire regarding a defendant’s right not to testify and the jurors’ collective response that they could accept the defendant’s right not to testify and not hold it against her. This Court further noted defense counsel had explained the defendant’s right against self-incrimination.
In this case, as in Bush, there were no further questions asked of Mr. Vinturella to establish his impartiality after his seemingly prejudicial statement. However, also like Bush, the record shows the prospective jurors were instructed on the defendant’s right not to testify and asked if any of them would still want defendant to testify. Further, Mr. Vinturella expressly stated he presumed defendant was innocent and he was not looking for defendant to present evidence of his innocence. He further stated he would listen to all the evidence before making any determination.
Mr. Vinturella’s responses, taken as a whole, show he understood and accepted that the State had the burden of proving defendant’s guilt and that he could not hold defendant’s failure to testify against him. Thus, we find no abuse ofj^the trial judge’s discretion in denying defendant’s challenge for cause as to Mr. Vinturella.[26]

Prospective Juror William Montgomery

Defendant contends Mr. Montgomery should have been excused for cause because he indicated he would be suspicious of defendant’s guilt if he failed to testify. In response to questions by defense counsel about defendant’s choice against self-incrimination, Mr. Montgomery stated that he would have “a degree of suspicion” that defendant was guilty, if he failed to testify.
Defense counsel then asked Mr. Montgomery, “... are you in a position where unless he presents you with some evidence of his innocence, you’re leaning towards guilty?” Mr. Montgomery responded that he was not. He explained that he did not see how any normal human being could say they did not have some degree of suspicion.
Thereafter, defense counsel inquired whether Mr. Montgomery believed defendant started out “a little bit guilty” and had “to do something to get rid of that little bit guilty.” Mr. Montgomery stated that he was “not sure ... defendant could do anything to eliminate that suspicion” but noted “the burden is still on the prosecution.” He further explained that the psychological impact of that degree of suspicion varies with each individual. He concluded that he was not sure how to answer defense counsel’s question.
Defense counsel challenged Mr. Montgomery based on his suspicion of guilt. The State further contended Mr. Montgomery acknowledged that the State |Sfihad the burden of proof and stated he could listen to the evidence and be fair. The trial judge agreed with the State and denied defendant’s challenge for cause.
*564 “[T]he mere fact that a potential juror has a preconceived opinion as to the defendant’s guilt does not mandate removal for cause if ... the potential juror expresses an ability to disregard that opinion and render a verdict according to the law and evidence.” State v. Cousan, 94-2503, pp. 11-12 (La.11/25/96), 684 So.2d 382, 389. In State v. Scott,[27] the Louisiana Supreme Court found no error in the denial of a challenge for cause where a prospective juror admitted he had a general suspicion of defendant’s guilt. The supreme court stated the challenged juror’s overall responses showed him to be a fair person and concluded he had been successfully rehabilitated. In the opinion, the supreme court set forth the challenged juror’s many responses, which showed that despite the prospective juror’s suspicion of guilt, he specifically stated he hoped he could be fair and impartial in determining defendant’s guilt or innocence.[28]
In the present case, Mr. Montgomery’s overall responses during voir dire do not indicate his suspicion rendered him impartial. In fact, he specifically stated his suspicion was not leaning him towards believing defendant was guilty and reiterated that the State still had the burden of proof. Mr. Montgomery never expressed his inability to afford defendant the presumption of innocence as mandated by law.[29] The trial judge had the benefit of seeing Mr. Montgomery’s [.^facial expressions and hearing his vocal intonations throughout voir dire. A review of the voir dire as a whole, and considering the trial judge’s broad discretion, it does not appear the trial court erred in denying this challenge for cause. Based on the foregoing, we find no merit to this assignment of error.
In his third assignment of error, defendant argues that the trial judge’s removal of counsel of choice was structural error. Specifically, defendant argues that he was deprived of his Sixth Amendment right to counsel when the trial court dismissed his appointed defense counsel, G. Ben Cohen, on the State’s motion. The State responds that the trial court’s ruling dismissing Mr. Cohen from the case was correct in light of the Louisiana Supreme Court Rules.
First, the State filed its “Motion to Traverse Qualifications to Represent Indigent Defendant in Capital Murder Case or Alternatively Motion to Disqualify Counsel for Defense”[30] in 2004. The trial judge *565 noted that Cohen admitted that he was not qualified to serve as either lead trial counsel or “second chair,” and granted the State’s motion.
As noted previously, in May 2005, many months before trial began, the State reduced the charges against defendant to second degree murder, which is punishable by life imprisonment. The record does not reflect that defendant sought |37to have Mr. Cohen reinstated as defense counsel after the case was no longer a capital case. As such, we do not see an appealable issue.
Further, even if this were a justiciable issue, the United States Supreme Court has found that the Sixth Amendment guarantees a defendant the right to adequate representation, but does not guarantee an indigent defendant the right to choose his appointed counsel.[31] More recently, in United States v. Gonzalez-Lopez, 548 U.S. 140, 144, 126 S.Ct. 2557, 2561, 165 L.Ed.2d 409 (2006), the Supreme Court restated that the Sixth Amendment encompasses the right of a defendant who does not require appointed counsel to choose who will represent him, but an indigent defendant does not have the right to counsel of choice.
Furthermore, Article I, § 13 of the Louisiana Constitution provides, in relevant part: “At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment.” The Louisiana Supreme Court has held that an indigent defendant has a right to court-appointed counsel, but that the Sixth Amendment does not guarantee him a right to a particular attorney. State v. Leger, 05-0011, p. 43 (La.7/10/06), 936 So.2d 108, 142, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); State v. Harper, 381 So.2d 468, 470-71 (La.1980). Similarly, this Court has held that “an indigent defendant does not have the right to have a particular attorney appointed to represent him.” State v. Bruce, 03-918, p. 7 (La.App. 5 Cir. 12/30/03), 864 So.2d 854, 859. Based on the jurisprudence, defendant, who was indigent, did not have the constitutional right to choose his appointed counsel. This argument lacks merit.
| ¡⅜⅛ his fourth assignment of error, defendant argues that the trial court erred in admitting the gruesome autopsy *566 “rod” photographs because their prejudicial nature substantially outweighs their probative value. Specifically, defendant argues that he had a right to a fair trial that is unencumbered by emotion, which was violated when the State introduced gruesome photographs with rods in the victims’ heads, suggesting that the offenders had skewered the victims to death.
Defendant contends that the admissibility of the autopsy “rod” photographs was extensively litigated before trial,[32] and the State misled the trial court into believing the rod photographs would have independent relevance when they did not. Further, defendant argues the rod photographs were extremely prejudicial, had little probative value, and were cumulative. The State responds that the trial court’s ruling was correct because the rod photographs depicted the course of the wounds through the victims and were illustrative of its theory that the victims were shot by two gunmen.
First, we note that defendant challenges the “rod photographs” but fails to specify which exhibit is at issue. The record re-fleets that the “rod photographs” were admitted into evidence as State’s Exhibits 5, 6,10, and 11.
Regarding State’s Exhibits 5 and 6, Dr. Garcia identified them as photographs taken of Nelson Beaugh at the autopsy. The trial judge admitted these |39two photographs into evidence subject to defendant’s “previous objection[s.]” However, Dr. Garcia did not refer to these photographs during her explanation of the course and track of the bullets that killed Nelson Beaugh. Rather, she explained the course and track using her own body.
Dr. Garcia identified State’s Exhibits 10 and 11 as photographs taken of Della Beaugh at the autopsy. State’s Exhibits 10 and 11 were also admitted into evidence subject to defendant’s “previous objection[s.]” Dr. Garcia used State’s Exhibits 10 and 11 when discussing the course and track of the bullet that struck Della Beaugh. She stated that State’s Exhibit 10 was “probably the most instructive,” and used this photograph to explain the course and track of the bullet, demonstrat *567 ing that the rod went through the entrance wound to the exit wound. She also used State’s Exhibit 11 to show a different perspective of the entrance wound.
Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” La. C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible. La. C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.
Generally, photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, subject to the test that their probative value outweighs any prejudicial effect. State v. Battaglia, 03-692, p. 10 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 710, writ denied, 04-1701 (La.4/29/05), 901 So.2d 1058. The State is 14nentitled to the moral force of its evidence, and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, wound placement, as well as to provide positive identification of victims. State v. Condley, 04-1349, p. 18 (La.App. 5 Cir. 5/31/05), 904 So.2d 881, 892-93, writ denied, 05-1760 (La.2/10/06), 924 So.2d 163.
The mere fact a photograph is gruesome does not, in and of itself, render it inadmissible. State v. Jones, 99-798, p. 7 (La.App. 5 Cir. 11/10/99), 748 So.2d 1176, 1179, writ denied, 00-0306 (La.12/8/00), 775 So.2d 1076. Photographic evidence is admissible unless it is so gruesome as to overwhelm the jurors’ reason and lead them to convict the defendant without sufficient evidence, i.e., when the prejudicial effect of the photographs substantially outweighs their probative value. Condley, 04-1349 at 18-19, 904 So.2d at 893. In general, an appellate court places great weight upon a trial court’s ruling on the relevancy of evidence and such a determination will not be reversed absent a clear abuse of discretion. Battaglia, 03-692 at 10, 861 So.2d at 711.
Defendant argues that he offered to stipulate to “whatever aspect of the autopsy report the State deems to be relevant, and any cause of death or factor that the State thinks is proven by photographs.” Although an offered stipulation bears upon the balancing test, the decision is primarily one for the trial court, and the State cannot be robbed of the moral force of its case merely because the stipulation is offered. State v. Watson, 449 So.2d 1321, 1326 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985).
Defendant argues that the State misled the trial court into believing the rod photographs would have independent relevance when they did not. Specifically, 141 defendant refers to the State’s contention that the photographs would assist the State in showing that there were two different people firing guns in that room.
First, defendant failed to raise this specific objection to these photographs at trial, and as such, this issue is not properly before this Court. See La. C.Cr.P. art. 841.
Second, even if this issue were before this Court, we cannot say that the trial court erred in its ruling. While the prosecutors certainly contended at the pre-trial hearing that the photographs could demonstrate bullet trajectories from two sepa *568 rate shooters, the State also admitted at the hearing that their expert could not definitively state the positions of the victims before the shooting, the number of shooters, or which perpetrator shot the victims.
Here, Dr. Susan Garcia explained that Della Beaugh was shot behind her left ear, so whoever discharged the weapon was most probably behind her on her left. Further, Dr. Garcia noted that Nelson Beaugh received entrance wounds to the front of his body. Thus, the State did not misrepresent to the trial court that the photographs would demonstrate the position of the shooter in relation to the victims.[33]
In State v. Bridgewater, 00-1529, p. 34 (La.1/15/02), 823 So.2d 877, 903-04 n. 34, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003), defendant’s co-perpetrator’s case, the Louisiana Supreme Court recognized that autopsy photographs, including some showing a metal rod inserted into the | ¿¡¡.victims’ bullet wounds, were properly admitted at trial. It noted that the photographs corroborated Dr. Garcia’s testimony regarding the trajectory of the bullets that killed the victims and that the probative value of the photographs were not outweighed by their prejudicial effect.
Further, photographic evidence is admissible unless it is so gruesome as to overwhelm the jurors’ reason and lead them to convict the defendant without sufficient evidence. See Condley, supra. As noted above, we have already concluded that the State presented sufficient evidence to convict defendant of second degree murder. In light of the foregoing, even if we were to reach this issue, we would find that the probative value of the photographs outweighed any prejudicial effect against defendant and, therefore, the trial court did not err in admitting the photographs into evidence. This assignment of error lacks merit.
In his fifth assignment of error, defendant argues that the trial court erred in allowing evidence of the [S]tage offense, which had no independent relevance to this case. Specifically, defendant complains that he was prejudiced by the trial court’s admission at trial of ‘other crimes’ evidence, i.e., defendant’s guilty plea to the armed robbery of Kenneth Stage on the day before the murders. Defendant argues that the armed robbery had no relevance to the issues in dispute in the murder trial, and it did not fall under any of the exceptions in La. C.E. art. 404 B.
On September 11, 2003, well before trial, the State filed a “Notice of Intent to Use Evidence of Other Crimes” pursuant to La.C.Cr.P. art. 720. By that notice, the prosecution sought to introduce evidence of the armed robbery of Mr. Stage to show “defendant’s motive, opportunity, intent, preparation, plan, knowledge, identity, ab *569 sence of mistake or accident” in accordance with La. C.E. art. 404B.
On July 1, 2004, the trial court held a Prieur hearing to determine the admissibility of the evidence that defendant robbed Mr. Stage at gunpoint. The |43State introduced the following evidence at the hearing: Mr. Stage’s testimony regarding the robbery; police reports from the robbery; and a computerized map of the locations of the murders at issue, the Stage robbery, and the site where Mr. Stage’s wallet was recovered.
The State did not introduce any evidence related to the Beaugh murders at the Prieur hearing. The prosecutor mentioned that Jacobs gave a statement admitting he went to the Beaugh residence to rob the victims, but the statement was not introduced. The prosecutor also noted in argument that Lieutenant Maggie Pernia previously testified Jacobs was staying at North Dells near where Stage’s wallet was recovered, but her testimony was not introduced.
At the hearing, Kenneth Stage testified that, on October 30, 1996, he lived at 2400 Timbers Drive.[34] On that date, between 8:30 and 9:00 a.m., his doorbell rang. Stage looked through the door’s peephole and saw a tall, young, African-American man, whom he identified in court as defendant. Taking defendant for a solicitor, Stage unlatched the door. Defendant then kicked the door open and stepped inside the house.
Stage testified that defendant held a .38 caliber gun to his head and demanded money and guns. Defendant threatened to kill Stage if he did not cooperate. Defendant forced Stage to accompany him through the house so that he could look for things to take. Defendant then put Stage in the master bedroom and ordered him not to leave the room. Stage testified that he could hear defendant rummaging through his belongings.
144At one point, Stage opened the bedroom door. Defendant told the victim not to come out of the room or he would shoot him. Stage went back into the bedroom and closed the door.
Stage said that after a while he no longer heard defendant. Stage escaped through a bedroom window and fled to the home of his next door neighbor. Stage saw the defendant stealing his car by driving it away without permission. The police reports show that Stage’s vehicle was recovered on North Dells Drive in Harvey where it had been driven into the garage door of a residence. Stage had no personal knowledge of the Beaugh murders.
Dr. Dee Harper, Jr. testified for the defense as an expert in criminology and the patterns of criminal violence. He reviewed various reports pertaining to crime . patterns in Jefferson Parish and concluded the Stage robbery and the Beaugh murders were dissimilar.
The State relied primarily on argument to prove admissibility of the robbery under La. C.E. art. 404 B, and maintained the following: (1) Stage lived approximately 20-25 blocks from the murder scene; (2) the armed robbery took place approximately 24 hours before the murder; (3) Stage’s property was found approximately five or six blocks from where it was stolen; (4) Jacobs used a .38 caliber gun, and there was evidence at the murder trial that the victims were killed with a .38 caliber gun; (5) Jacobs admitted in his statement *570 that he went to the Beaugh residence to rob them; and (6) Jacobs gave a statement saying that his gun was not loaded. The trial court agreed that the armed robbery evidence was relevant, and ruled that it was admissible at the murder trial.
Defendant filed a writ application in this Court challenging the trial court’s ruling. This Court granted the writ because there was insufficient information in the transcript about the Beaugh murders to determine whether the trial" judge Improperly admitted evidence of the Stage offense. This Court remanded the matter with instructions to the trial judge to re-evaluate the admissibility of the Stage offense after an evidentiary hearing, in which all evidence deemed pertinent to the issue would be introduced. This Court noted that the trial court had apparently based its ruling on information not in the hearing record.
Additionally, this Court directed the trial court to determine whether the purpose asserted by the State for the admission of ‘other crimes’ evidence was a material fact genuinely at issue and allowed under Article 404B, and whether the probative value-of the evidence outweighs its prejudicial impact. State v. Jacobs, 04-915 (La.App. 5 Cir. 8/31/04) (unpublished writ).
Defendant applied to the Louisiana Supreme Court for review, arguing that the State should not be granted a second opportunity to show that ‘other crimes’ evidence was admissible. The supreme court denied writs. State v. Jacobs, 04-2422 (La.12/10/04), 888 So.2d 842.
In accordance with this Court’s order, the trial court re-opened the Prieur hearing on May 13, 2005. The State introduced the testimony of Lieutenant Maggie Pernia of the Jefferson Parish Sheriffs Office. Lieutenant Pernia stated that, on October 31, 1996, she responded to a double murder in the 2000 block of Cedar Lawn. She was at the scene when defendant’s name came up in relation to the Stage robbery that had occurred the day before.
Lieutenant Pernia testified that the incidents were similar in that they were both home invasions in which the victims were forced into their homes at gunpoint, the incidents occurred close in distance to each other, both incidents happened at around 9:00 a.m., and that in each case, the victim’s vehicle was used to flee the scene. Additionally, Lieutenant Pernia testified that a .38 caliber [ ^weapon was used in the Stage offense, and that .38 caliber class ammunition was recovered in the double murder.
Lieutenant Pernia further testified that defendant was staying on North Dells at the time. According to the officer, the North Dells location, the Stage residence, and the Beaugh residence were all within walking distance of each other.
The State introduced Lieutenant Per-nia’s supplemental report on the murders and defendant’s recorded statement. According to Lieutenant Pernia, defendant related that he and Bridgewater, who were both armed, approached Mr. Beaugh with a robbery motive. According to defendant, Bridgewater held guns on the victims while defendant loaded the van with the victims’ belongings. Defendant claimed that he was going to disable the telephones in the house, but that Bridgewater told him the victims would not be able to call the police when they left. When Bridge-water told him to go to the van, defendant realized what Bridgewater was going to do. He heard the first two gunshots when he entered the garage. Defendant said he was armed with a .32 and that Bridgewa-ter had a .357.
Defendant filed a post-hearing memorandum on May 27, 2005. On July 20, 2005, the trial judge issued a judgment *571 with reasons granting the State’s motion to introduce the ‘other crimes’ evidence. The judge listed several similarities between the armed robbery and the murders, and stated that the robbery was sufficiently similar to the murders to be admissible to prove defendant’s motive, opportunity, identity, and system. The judge further held that any prejudicial harm defendant would suffer was outweighed by the probative value of the evidence.
Defendant again applied for writs to this Court from the trial court’s ruling, and this Court denied the writ. State v. Jacobs, 05-819 (La.App. 5 Cir. 10/19/05) (unpublished writ). This Court reasoned, in part:
|47In the present case, the trial judge found that the Stage robbery was relevant to prove relator’s motive, opportunity, identity, and system based on several factors: both crimes began as aggravated burglaries, both crimes involved forcible entry with occupants at home, both crimes were committed near each other, both crimes were committed within a 24-hour period of each other, both crimes were committed in the early morning hours, around 9:00 a.m., and in both crimes, the perpetrators escaped in the victim’s automobiles.
The record supports the trial judge’s findings regarding the similarities between the Stage robbery and the double homicides for which relator is now on trial. In addition, the trial judge correctly determined that the Stage robbery was independently relevant to prove a material fact at issue under La. C.E. 404(B), relator’s specific intent. Relator’s holding a loaded .88 caliber handgun to Kenneth Stage’s head, accompanied by threats to kill Stage is indicative of relator’s intent to kill Stage. (Citations omitted).
Defendant applied to the Louisiana Supreme Court for writs of review of this Court’s decision, which were denied. State v. Jacobs, 05-2468 (La.6/16/06), 929 So.2d 1276.
On appeal, defendant argues that the armed robbery was not relevant to the charge of second degree murder. He also contends that the State used the evidence simply to portray him as a bad person, which is not permissible under La. C.E. art. 404 B.
Although it is not usually our practice, in this matter, which has been thoroughly litigated and reviewed, we decline to reconsider this claim as it is the “law of the case.” Under the doctrine of the “law of the case,” an appellate court will generally decline to consider its own rulings of law on a subsequent appeal in the same case. State v. Burciaga, 05-357, p. 5 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128.
The principle is applicable to all decisions of an appellate court; not solely those arising from full appeal. State v. Johnson, 06-859, p. 12 (La.App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite relitigation of the same issue; but it will not be applied in Incases of palpable former error. Id. Reconsideration is warranted when, in light of subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis, 03-488, p. 6 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 641 n. 2, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874.
Even the defendant concedes that the Prieur issue was extensively litigated on writs prior to trial, although he asks this Court to revisit the issue in view of the fact that the charge was reduced from first to second degree murder after his writ *572 applications. Defendant further argues that this Court should take into account his offer to stipulate that he possessed a gun on the day before the Beaugh murders.
Because we find that the Prieur issue was fully litigated in defendant’s pre-trial writs, and this Court’s prior ruling does not constitute “palpable former error,” we decline to review the matter on appeal under the “law of the case” doctrine. See State v. Johnson, 06-859 at 12, 957 So.2d at 840; State v. Hollimon, 04-1195, pp. 3-4 (La.App. 5 Cir. 3/29/05), 900 So.2d 999, 1000-01.
Moreover, even if the amended charge necessitated further review of the Prieur issue on appeal, we would find no error in the trial court’s admission of ‘other crimes’ evidence that defendant robbed Mr. Stage at gunpoint on the day before the murders. Generally, evidence of other crimes or bad acts committed by a criminal defendant is inadmissible at trial to impeach his character. La. C.E. art. 404 B; State v. Blank, 04-0204, p. 39 (La.4/11/07), 955 So.2d 90, 123, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007); State v. Prieur, 277 So.2d 126, 128 (La.1973). But such evidence may be admissible to prove “motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.” La. C.E. art. 404 B(l).
LflOne of those enumerated factors must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible. State v. Hernandez, 98-448, p. 16 (La.App. 5 Cir. 5/19/99), 735 So.2d 888, 897, writ denied, 99-1688 (La.11/12/99), 750 So.2d 194. Even when ‘other crimes’ are relevant, the probative value of unrelated offenses must be weighed against their possible prejudicial effect. Blank, 04-0204 at 39, 955 So.2d at 123; State v. Smart, 05-814, p. 11 (La.App. 5 Cir. 3/14/06), 926 So.2d 637, 647, writ denied, 06-1225 (La.11/17/06), 942 So.2d 533.
In the instant case, the trial judge found that the Stage robbery was relevant to prove defendant’s motive, opportunity, identity, and system based on several factors: both crimes began as aggravated burglaries, both crimes involved forced entry where the occupants were at home, both crimes were committed in the same geographic area, both crimes were committed within a 24-hour period, both crimes were committed in the early morning hours (around 9:00 a.m.), and in both crimes, the perpetrators escaped in the victims’ vehicles.
Defendant argues that, after the charges against him were reduced to second degree murder, there was no valid basis for the admission of armed robbery evidence because none of the reasons for which the State sought to introduce the ‘other crimes’ evidence was at issue at trial. However, La. R.S. 14:30.1 defines second degree murder as the killing of a human being where there is either specific intent to kill or inflict great bodily harm; or where the offender is engaged in one of the enumerated felonies.
Defendant took the position in his statement to Lieutenant Pernia that robbery was his sole motive, that he was not the shooter in the Beaugh murders, and that he had no knowledge beforehand that Bridgewater planned to kill the |Sflvictims. Essentially, defendant placed himself in a secondary role in the Beaugh murders.
The Louisiana Supreme Court has recognized that it is proper to admit proof of similar but disconnected crimes to show the intent with which the act charged was committed, where the element of intent is an essential ingredient of the charged offense. State v. McArthur, 97-2918, p. 2 *573 (La.10/20/98), 719 So.2d 1037, 1040 (citations omitted).[35] The pattern/plan exception requires a determination that a defendant achieved an ultimate goal through a series of related crimes. McArthur, 97-2918 at 3, 719 So.2d at 1042. The Louisiana Supreme Court has held ‘other crimes’ evidence admissible as proof of other crimes exhibiting almost identical modus operand;i or system, committed in close proximity in time and place. State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998).
Here, the record supports the trial judge’s findings regarding the similarities between the Stage robbery and the burglary/robbery that ended in double homicide for which defendant was tried in this case. Additionally, evidence of the Stage robbery was independently relevant to prove a material fact at issue under La. C.E. art. 404 B: defendant’s specific intent.
The fact that defendant held a loaded .38 caliber gun to Kenneth Stage’s head, and threatened to kill Stage is indicative of defendant’s specific intent to inflict great bodily harm or kill Mr. Stage. See State v. Silva, 96-459, p. 16 (La.App. 5 Cir. 11/26/96), 685 So.2d 1119, 1126, writ denied, 96-3067 (La.6/13/97), 695 So.2d 964 (aiming a firearm directly at a victim is indicative of an intent to kill or inflict great bodily harm for purposes of second degree murder). The robbery evidence was relevant to refute defendant’s assertion that he played a secondary role in the murders. If he was capable of committing the Stage robbery on his own, then he was capable of playing a primary role in the Beaugh incident.
In State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, 1330-31, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996), the supreme court held that the defendant’s prior Pizza Hut robbery was sufficiently similar to a subsequent robbery of Church’s restaurant in which the victim was fatally shot to constitute admissible ‘other crimes’ evidence. The Scales court reasoned that the defendant’s participation in the Pizza Hut robbery was relevant because of his contention at trial that he did not know of his companion’s intent to rob Church’s, that he did not intend to commit a robbery, and that he shot the victim in self-defense. Therefore, evidence of the Pizza Hut robbery was admissible to prove motive, intent, knowledge, and absence of mistake or accident in connection with proving the element of the State’s first degree murder case (that defendant was engaged in the commission of an armed robbery) and to rebut his claim of self-defense.
Finally, although the armed robbery evidence in the instant case was prejudicial to defendant, the Louisiana Supreme Court has recognized that “all relevant evidence providing proof of the charged crime is prejudicial, and often the degree of probative value increases the degree of prejudice.” State v. Martin, 93-0285, p. 13 (La.10/17/94), 645 So.2d 190, 198, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Thus, even if we were to reach this issue, we would find no merit in this argument.
In his sixth assignment of error, defendant argues that the trial court erroneously denied his proposed instructions on leniency and the rights of the jury. Defendant argues that the trial court violated his Sixth Amendment right to a fair | ¡atrial by refusing to deliver two of his *574 proposed jury charges. The State responds that the instructions given by the trial court were correct statements of the law, and that the judge did not abuse his discretion in refusing the proposed charges.
Defendant submitted a total of nine proposed jury charges. On August 25, 2006, the trial court accepted the first seven defense charges, and denied charges eight and nine. On that day, defendant filed an emergency writ application in this Court, challenging the trial court’s ruling. This Court denied the writ, stating, “On the showing made, we find no error in the trial court’s ruling denying relator’s request for a stay of proceedings and his request for a special jury charge.” State v. Jacobs, 06-621 (La.App. 5 Cir. 8/25/06) (unpublished writ).
Although it is not usually our practice, in this matter, which has been thoroughly litigated and reviewed, we decline to reconsider this claim as it is the “law of the case.” Under the doctrine of the “law of the case,” an appellate court will generally decline to consider its own rulings of law on a subsequent appeal in the same case. State v. Burciaga, 05-357, p. 5 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128.
The principle is applicable to all decisions of an appellate court; not solely those arising from full appeal. State v. Johnson, 06-859, p. 12 (La.App. 5 Cir. 4/11/07), 957 So.2d 888, 840. One reason for imposition of the doctrine is the avoidance of indefinite relitigation of the same issue; but it will not be applied in cases of palpable former error. Id. Reconsideration is warranted when, in light of subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis, 03-488, p. 6 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 641 n. 2, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874.
[^Because we find that this Court’s prior ruling does not constitute “palpable former error,” we decline to review the matter on appeal under the “law of the case” doctrine. See State v. Johnson, 06-859 at 12, 957 So.2d at 840; State v. Hollimon, 04-1195, pp. 3-4 (La.App. 5 Cir. 3/29/05), 900 So.2d 999, 1000-01.
Furthermore, even if we were to address the propriety of the trial court’s denial of defendant’s proposed jury charges, we would not find any error. Under La.C.Cr.P. art. 802, the trial court “shall charge the jury ... [a]s to the law applicable to the ease[.]” The State and the defendant shall have the right to submit special jury charges. The court shall give a requested special jury charge “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” La.C.Cr.P. art. 807. See also State v. Tate, 01-1658, p. 20 (La.5/20/03), 851 So.2d 921, 937, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Fasola, 04-902, p. 19 (La.App. 5 Cir. 3/29/05), 901 So.2d 533, 545, writ denied, 05-1069 (La.12/9/05), 916 So.2d 1055. Failure to give a requested jury charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Harris, 01-2730, p. 46 (La.1/19/05), 892 So.2d 1238, 1261, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005).
In this case, the first of defendant’s proposed charges that was rejected provided, “You may convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged crime.” In pro *575 posing this instruction, defendant relied on the traditional authority of juries to return a compromise verdict on a lesser-included, responsive offense lleven in the face of overwhelming proof of the charged offense. State v. Porter, 93-1106, p. 4 (La.7/5/94), 639 So.2d 1137, 1140.
Treating the jury’s prerogative to return a responsive verdict similar to the jury’s power of nullification, this court has consistently held that the jury must be given the option to convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged offense.

Id.

The Second Circuit addressed a similar situation in State v. Sharp, 35,714 (La.App. 2 Cir. 2/27/02), 810 So.2d 1179, writ denied, 02-1736 (La.6/6/03), 845 So.2d 1081. Sharp was tried and convicted of second degree murder. The defendant requested a jury instruction providing that the jury had the option of convicting him of the lesser offense of manslaughter, even if the evidence supported a second degree murder conviction. The trial court rejected the proposed charge.
On appeal, the Second Circuit found the trial court had not erred in rejecting the proposed charge, since the trial court clearly instructed the jury that it could return a responsive verdict of manslaughter. The court explained,
To expound the responsive verdict law in the way that Sharp suggests would, in our opinion, require, at the very least, qualification and certainly explanation. There is no Louisiana jurisprudence supporting an argument that it is proper to instruct a jury that it can disobey law and reach a verdict inconsistent with the evidence. In this case, the general instruction was adequate to instruct the jury on this point.
Sharp, 35,714 at 19-20, 810 So.2d at 1192.
In this case, as in Sharp, the use of defendant’s proffered charge might have caused the jury to misunderstand or even disobey the law on responsive verdicts. The record in this case shows the trial court properly instructed the jury that it could return a verdict of a lesser-included offense. The judge explained that the responsive verdicts in this case were: guilty of second degree murder, guilty of | ^manslaughter, guilty of negligent homicide, and not guilty. Since defendant’s requested special jury charge was included in the court’s general charge, the general jury charge was sufficient to impart the law on responsive verdicts to the jury.
Next, defendant’s other proposed charge that was rejected provided:
Sentencing is not the function of the jury. It is the duty and responsibility of the court. However, in order to assure that you are fully advised of the law, I have chosen to inform you of the penalty provided by the statute:
In this case, if you convict the defendant of manslaughter, the court may sentence him to serve a term of imprisonment at hard labor for a period not to exceed 40 years.
La. Civil Law Treatise: Criminal Jury Instructions, 3.09.
Defendant argues that he was prejudiced by the trial court’s refusal to instruct the jury as to the sentencing range for manslaughter. However, the trial court had no duty to advise the jury of the sentencing provisions for manslaughter. The Louisiana Supreme Court has stated:
When the penalty imposed by the statute is a mandatory one, the trial judge must inform the jury of the penalty on *576 request of the defendant and must permit the defense to argue the penalty to the jury. In instances other than when a mandatory legislative penalty with no judicial discretion as to its imposition is required following verdict, the decision to permit or deny an instruction or argument on an offense’s penalty is within the discretion of the trial judge.
State v. Jackson, 450 So.2d 621, 633-34 (La.1984) (citations omitted).
The record shows the trial court advised the jury of the mandatory life term for second degree murder, but did not advise the jury of the penalties for the responsive charges of manslaughter and negligent homicide. The judge also instructed the jury that “[sentencing is not the function of the jury. It is the duty and responsibility of the court.” Since there is no mandatory sentence for manslaughter, the trial court had no obligation under the jurisprudence to inform [ fifithe jury of the sentencing range for that offense. Based on the foregoing, we find no error in the trial court’s refusal of either of these proposed jury charges. This assignment of error lacks merit.
In his eighth assignment of error, defendant contends that the trial court’s exclusion of relevant evidence violated Lawrence Jacobs’ right to due process and a fair trial. Specifically, defendant argues that the trial court deprived him of his due process rights by prohibiting him from introducing evidence of the State’s arguments, at his co-defendant’s trial, that his co-defendant, Roy Bridgewater, was the more culpable party. Defendant further contends that he was prejudiced by the trial court’s refusal to allow the testimony of Dr. Fred Sautter regarding Bridgewa-ter’s mental disorders.
Prior arguments by the State
On December 6, 2002, defendant filed a “Motion to Use Prior Government Statements as Evidence,” in which he asked the trial court to allow him to introduce arguments the State made at the Bridgewater trial that Bridgewater was the leader in the Beaugh murders. The motion was argued on January 27, 2003, and the trial court took the matter under advisement. On June 5, 2003, the trial court issued a Judgment denying the motion without reasons.
Defendant filed an application for supervisory review with this Court challenging the trial court’s ruling. This Court denied writs, stating:
Arguments of counsel are not evidence. State v. Wingo, 457 So.2d 1159, 1167 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322, rehearing denied, 471 U.S. 1145, 105 S.Ct. 2691, 86 L.Ed.2d 708. Since arguments by attorneys are not admissible, we find no error in the ruling of the Court below. (See, State v. Wingo, supra at 1167, wherein the Court found that a prosecutor’s theories and comments at a co-defendant’s trial were not “evidence” which could properly be admitted during defendant’s current trial). However, in the event that the evidence introduced at the subsequent trial is inconsistent with that adduced at a prior trial or trials, said evidence from the prior proceeding can be brought to the Court’s attention at [ S7the subsequent trial and, if relevant and otherwise admissible, be introduced at that time.
State v. Jacobs, 03-845 (La.App. 5 Cir. 8/19/03) (unpublished writ). Defendant applied for writs of review to the Louisiana Supreme Court, which were denied. State v. Jacobs, 03-2614 (La.11/24/04), 888 So.2d 218.
On June 22, 2005, defendant filed a motion entitled “Renewed Motion to Introduce Statements of Party-Opponent Based *577 upon the Recent United States Supreme Court Opinion in Bradshaw v. Stumpf.” In this motion, defendant again argued that he should be allowed to alert the jury to the State’s inconsistent positions, and asked the trial court to reconsider its ruling in light of the United States Supreme Court’s opinion in Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005).[36]
In this motion, defendant acknowledged that the Bradshaw court did not address the merits, but argued the concurring opinions in Bradshaw supported his position. For example, Justices Thomas and Scalia noted in their concurrence that the high court “never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.” 545 U.S. at 190, 125 S.Ct. at 2409. But they cautioned that “a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the fact-finder’s attention.” 545 U.S. at 191-92, 125 S.Ct. at 2410.
On August 8 and 24, 2005, the trial court heard arguments on defendant’s motion. On August 24, 2005, the trial court denied the motion without reasons. 1 .^Defendant filed a writ application to this Court challenging the trial court’s ruling. In his writ application, defendant included transcripts of the trial court proceedings, as well as portions of the State’s arguments at Bridgewater’s trial.
This Court denied the writ, stating:
Defendant seeks review of a trial court ruling denying both his motion to prohibit the State from arguing that he was more culpable than the previously tried co-defendant and his alternative motion to allow him to introduce into evidence the State’s arguments from the previous trial. Defendant argues that since the State argued in his co-defendant’s trial that the co-defendant was the person who executed the victims, the State should not be permitted to argue in the present trial that defendant played a dominant role, as the two positions are inconsistent.
Although defendant has not submitted the entire transcripts of the prosecutor’s arguments in the previous trial, we have reviewed the opinion of the Supreme Court rendered in that case. State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877, 889, cert. denied, Bridgewater v. Louisiana, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). We find that the Supreme Court’s characterization of the State’s theories in the Bridgewater case is not inconsistent with the position taken by the current prosecutor in this case. By this writ application, defendant has failed to make a showing that this is a situation *578 where the prosecutor adopted such a fundamentally inconsistent position at separate trials of two co-perpetrators or presented inconsistent evidence and testimony that basis [sic] fairness might require the trial court to permit the exposure of the inconsistent positions. See, State v. Wingo, 457 So.2d 1159 (1984), cert. denied, Wingo v. Louisiana, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985).
Further, as the trial in the present case has not yet begun, defendant’s arguments regarding the State’s theories and other crimes evidence are premature. Additionally, this Court has previously denied writs from an identical motion filed in this case, and we decline to reconsider the merits of that ruling at this point of the proceedings. State v. Jacobs, 03-845 (La.App. 5 Cir. 8/19/03), writ denied, 03-2614 (La.11/24/04), 888 So.2d 218.
Accordingly, on the showing made, we are unable to find an abuse of discretion of the trial court in denying defendant’s motions.
State v. Jacobs, 05-1015 (La.App. 5 Cir. 2/9/06) (unpublished writ). The Louisiana Supreme Court subsequently denied writs. State v. Jacobs, 06-0506 (La.5/5/06), 927 So.2d 321 (unpublished writ).
| ñ9Pefendant now contends the State’s arguments at the Bridgewater trial were admissible evidence at his trial to show the State’s conflicting theories, and that he was deprived of his due process rights when he was barred from introducing that evidence. Specifically, defendant complains that at Bridgewater’s trial the State indicated the Stage robbery was irrelevant to the murder case, since Bridgewater was the shooter. That contradicts the State’s theory in defendant’s trial: that the Stage robbery was relevant to show defendant was capable of being the shooter in the murders. Defendant contends that, if admitted at his trial, the State’s statements in the Bridgewater trial would have undermined the State’s claim that the Stage robbery proved his intent to kill. The State counters that the jurisprudence does not support defendant’s argument, and that the trial court’s ruling did not deprive defendant of his right to due process.
Again, we note that this issue was thoroughly litigated and reviewed, so we decline to reconsider this claim as it is the “law of the case.” Under the doctrine of the “law of the case,” an appellate court will generally decline to consider its own rulings of law on a subsequent appeal in the same case. State v. Burciaga, 05-357, p. 5 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128.
The principle is applicable to all decisions of an appellate court; not solely those arising from full appeal. State v. Johnson, 06-859, p. 12 (La.App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite relitigation of the same issue; but it will not be applied in cases of palpable former error. Id. Reconsideration is warranted when, in light of subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis, 03-488, p. 6 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 641 n. 2, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874.
| fiflBecause we find that this Court’s prior ruling does not constitute “palpable former error,” we decline to review the matter on appeal under the “law of the case” doctrine. See State v. Johnson, 06-859 at 12, 957 So.2d at 840; State v. Hollimon, 04-1195, pp. 3-4 (La.App. 5 Cir. 3/29/05), 900 So.2d 999, 1000-01.
Furthermore, even if we were to address the merits of the defendant’s ar *579 gument that the trial court erred in denying defendant’s request to introduce evidence of the prosecution’s inconsistent theories, we would not find any error. The Louisiana Supreme Court has held that, “[a]s a general matter, due process forbids a State from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event.” State v. Scott, 04-1312, p. 80 (La.1/19/06), 921 So.2d 904, 957, cert. denied, 549 U.S. 858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006), overruled in part on other grounds by State v. Dunn, 07-0878 (La.1/25/08), 974 So.2d 658 (per curiam).
In Scott, supra, three men, armed with weapons, robbed a bank. Two tellers were shot and killed in the course of the robbery. Scott was tried and convicted of first degree murder, and was sentenced to death. On appeal, Scott argued his due process rights were violated because the State argued at his trial that he was responsible for the deaths of the two bank tellers, while the State had argued at Dunn’s trial that Dunn was the shooter.
The Scott court found there was no due process violation. The prosecutor who tried both Scott and Dunn did not argue a division of culpability. Rather, at each of the separate trials, the prosecutor argued each defendant’s specific intent to kill or inflict great bodily harm, in keeping with the elements of La. R.S. 14:30. Nothing the State articulated in James Dunn’s case exonerated or exculpated Anthony Scott, as he and Dunn were principals to the same crimes. Id.
| fi1 Similarly, in the instant case, the State did not make a division of culpability between Bridgewater and defendant. The record shows the State did not produce inconsistent evidence in the trials of defendant and Bridgewater. Moreover, the prosecutors did not present opposing theories in trying the cases. Defendant and Bridgewater were the only eyewitnesses to the murders, and each of them accused the other of being the shooter. The State argued at both trials that either one of them (or both of them) could have been the shooter. Apparently, the State attributed equal responsibility for the shootings to both offenders under the law of principals. Defendant fails to show that he was deprived of a fair trial. See also, State v. Dressner, 08-1366, p. 18 (La.7/6/10), 45 So.3d 127, 139 (nothing inherently irreconcilable about arguing each perpetrator’s specific intent in his separate trial); State v. Holmes, 06-2988, pp. 23-30 (La.12/2/08), 5 So.3d 42, 61-65, cert. denied, — U.S. —, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009) (State’s emphasis on each offender’s culpability at their respective trials constituted neither inconsistent nor mutually exclusive theories of the crime). Thus, even if we were to reach the merits of defendant’s arguments, we would find no error.
Dr. Sautter’s Testimony
Defendant complains that he was deprived of his due process rights by the trial court’s exclusion of expert testimony by Dr. Fred Sautter, who performed Bridgewater’s mental evaluation. Defendant wanted to use the doctor’s testimony to show that Bridgewater was likely the dominant actor in the shootings. The State argues that the doctor’s testimony was not relevant, and was, thus, properly suppressed by the trial court.
During the presentation of defendant’s case, out of the jury’s presence, defense counsel moved the trial court to allow her to present testimony by Dr. Sautter, who had testified during the penalty phase of Bridgewater’s trial. Counsel | ^indicated that the doctor had interviewed and evaluated Bridgewater. Counsel stated that she sought to use the testimony to show Bridgewater suffered from a mood disor *580 der, that he was a controlling personality who would have been the dominant player in any relationship with another adolescent, and that he likely would have resorted to violence in a high-stress situation.[37]
The prosecutor argued Dr. Sautter should not be allowed to testify, as his testimony would constitute hearsay, and it was irrelevant. The prosecutor stated that the defense sought to use the doctor’s testimony to show Bridgewater was the shooter, and that was an ultimate issue of fact for the jury. Also, the State argued that the defense could not show the doctor’s testimony was reliable. The trial court denied defendant’s motion without reasons, and the defense objected.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution provide that a criminal defendant has the constitutional right to present a defense. Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201. But these constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence; only that which is deemed trustworthy and has probative value. State v. Governor, 331 So.2d 443, 449 (La.1976).
Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than without the evidence. La. C.E. art. 401. A trial judge, in deciding the issue of relevancy, must determine whether the evidence bears a rational connection to the facts at issue in the case. State v. Chester, 97-2790, p. 17 (La.12/1/98), 724 So.2d 1276, 1287, cert. denied, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999). Absent a clear abuse of discretion, the trial judge’s determinations concerning relevancy and admissibility of evidence should not be overturned. State v. Lyles, 03-141, p. 13 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 47.
Except as limited by the Code of Evidence and other laws, all relevant evidence is admissible and all irrelevant evidence is inadmissible.' La. C.E. art. 402. Although relevant, evidence may nonetheless be excluded if the probative value is substantially outweighed by its prejudicial effect. See La. C.E. art. 403.
Generally, expert opinion testimony is admissible if “scientific, technical, or other specialized knowledge will assist the trier of fact....” La. C.E. art. 702. Specifically, La. C.E. art. 704 provides:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an. ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
See also State v. Irish, 00-2086, pp. 5-6 (La.1/15/02), 807 So.2d 208, 212, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002).
The defense did not proffer Dr. Saut-ter’s testimony from Bridgewater’s trial. But assuming the doctor would have testified as defense counsel described, it does not appear the evidence would have been probative as to defendant’s guilt or innocence.
As the State argued, the defense wished to use evidence of Bridgewater’s mental health issues to show defendant’s state of mind at the time of the murders. Since *581 Dr. Sautter had never examined defendant, his opinion testimony regarding how defendant might have interacted with Bridgewater would have had — at best— questionable relevance. Moreover, the defense would have sought to elicit impermissible testimony going to the legal question of defendant’s guilt or | Minnocence. Based on the foregoing, we cannot say that the trial court abused its broad discretion in excluding the doctor’s testimony. This assignment of error lacks merits, also.
In his ninth assignment of error, defendant argues that his statements should have been suppressed. Specifically, defendant complains that the trial court erred in failing to suppress the tape-recorded statement he made to Lieutenant Maggie Snow on November 3, 1996. He argues that, because he was only 16 years old, the State had to prove that he knowingly and voluntarily waived his constitutional rights. Defendant maintains that uncontroverted expert testimony showed it was unlikely that he fully understood his rights. Moreover, defendant alleges that the State used unlawful inducements to obtain the statement. The State responds that this issue was fully litigated prior to trial in defendant’s writ applications, and that defendant’s arguments have no merit.
On December 6, 2002, defendant filed a “renewed” motion to suppress his police statement. On January 27, 2003, the State argued that defendant was not entitled to a hearing on the motion, since there had been two suppression hearings dealing with defendant’s police statement in connection with defendant’s first trial. That day, the trial court denied defendant’s motion without a hearing.
Defendant filed a writ application in this Court, arguing that the trial court erred in denying his suppression motion without a hearing. This Court granted the writ, finding that it would be an abuse of the trial court’s discretion not to allow defendant a hearing. This Court noted that defendant had now been re-indicted, he had new counsel, and his motion asserted new constitutional challenges to the police statement. State v. Jacobs, 03-389 (La.App. 5 Cir. 5/6/03) (unpublished writ). The State sought review of this Court’s disposition by the Louisiana Supreme Court, which was denied. State v. Jacobs, 03-1542 (La.10/10/03), 855 So.2d 331.
On September 24, 2004, defendant filed “Supplemental Grounds to Suppress Statement.” On May 13, 2005, defendant filed “Supplemental Grounds to Suppress Statement Based Upon Article. 810 of The Louisiana Children’s Code.”
The trial court held hearings on defendant’s motion to suppress his statement on August 26, 2004, and on May 12-13, 2005. The trial court deferred its ruling to allow the parties to file briefs on the matter. Defendant filed a brief on May 27, 2005. The trial court denied the motion to suppress statement on July 21, 2005.
Defendant sought review of the trial court’s ruling in this Court. In its writ disposition, this Court ruled:
The constitutional privilege against self-incrimination and the right to counsel apply equally to juveniles and adults. State v. Terrick, 03-515 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1159, writ denied, 03-3272 (La.3/26/04), 871 So.2d 346. The determination of whether a waiver of constitutional rights is knowing and voluntary is made on a case-by-case basis, and a defendant’s age is one factor for consideration in determining whether an accused’s statement is knowing and voluntary. Id. A trial judge’s ruling on the voluntariness of a statement is given great weight, and it will not be disturbed on review unless clearly unsupported by the evidence. State *582 v. Vigne, 01-2940 (La.6/21/02), 820 So.2d 533, 537.
After careful review of the writ application, the exhibits before us, and the applicable case law, we find no error in the trial court’s ruling that relator’s statement is admissible at trial. The evidence supports the trial court’s finding that relator’s statement was knowing and voluntary, and was not taken in violation of the law. Accordingly, relator’s writ application is denied.
State v. Jacobs, 05-820 (La.App. 5 Cir. 10/19/05) (unpublished writ). Defendant applied for a writ of review in the Louisiana Supreme Court, which was denied. State v. Jacobs, 05-2406 (La.6/16/06), 929 So.2d 1275.
| ^Thereafter, defendant’s taped statement was ultimately admitted at trial and played for the jury without objection from the defense. Further, a transcript of the statement was entered into evidence for record purposes.
Upon review, we find that this issue was thoroughly addressed in previous rulings of this Court. Further, the testimony at trial regarding defendant’s statement was not substantially different from the testimony given at the motion hearing. On appeal, defendant has produced no new arguments or evidence to show that the prior disposition of this Court was patently erroneous. For the foregoing reasons, we decline to review this issue in accordance with the “law of the case” doctrine. See State v. Johnson, 06-859, p. 12 (La.App. 5 Cir. 4/11/07), 957 So.2d 833, 840.
Moreover, even if we were to reach the merits of this issue, defendant’s arguments have little merit. At the suppression hearing, Lieutenant Maggie P. Snow testified that she took the defendant’s statement on November 3, 1996 around 12:15 AM. Lt. Snow stated that the defendant’s father was present when she read defendant his Miranda[38] rights. Lt. Snow testified that she informed them that defendant was under arrest for first degree murder and that she wanted to question the defendant about the murders of Nelsomand Della Beaugh. She testified that she told the defendant and his father that she wanted them to understand the defendant’s rights before he decided whether to agree to be questioned. Lieutenant Snow also testified that she allowed the defendant and his father to speak to one another privately before any questioning.[39]
Before the questioning began, the defendant’s father signed an acknowledgment on the waiver of rights form that he understood the defendant’s | ^rights with regard to being questioned. Defendant’s father also acknowledged that he had discussed the following facts with the defendant: if defendant agreed to answer questions, anything defendant said could be used against him in court; that defendant had the right to refuse to answer questions; that defendant had the right to have an attorney appointed to represent him without cost; and, that defendant had the right to stop answering questions at any time.
Defendant signed the Miranda waiver of rights for juveniles indicating that he had discussed with his father his right to remain silent and to refuse to answer questions. Defendant agreed that he and his father discussed the facts that, if he *583 agreed to answer questions, anything he said could be used against him and that he had the right to have a lawyer appointed without cost to him to represent him. He agreed that he understood those rights and agreed to answer questions without a lawyer present.
Defendant also agreed that no threats or promises had been made to him nor had any pressure of any kind been used to try to get him to answer questions or to give up any of his rights. Further, he understood that he had the right to stop answering questions at any time. Finally, defendant initialed each individual right as they went through them and initialed that he understood the rights. According to his signed waiver of Miranda rights form, defendant completed the ninth grade.
Lt. Snow stated that, before she began questioning defendant, she went over each individual right with defendant and his father again on the tape. Lt. Snow stated that, after she read him his rights, she asked the defendant if he wanted to give a statement and he and his father consented. Neither defendant nor his father asked for an attorney during the interview.
| fiSLt. Snow stated that she neither threatened anyone nor promised anything in order to obtain a statement. Further, she did not observe that defendant was yawning during the interview.
On the other hand, defendant’s uncles testified differently. They testified that Lt. Snow induced defendant into giving a statement without providing him with Miranda warnings.
Clarence Jacobs testified, that in November 1996, the defendant unexpectedly arrived at his home in Mississippi. Clarence’s wife had already spoken to the defendant’s father, who was on his way there to retrieve the defendant. Clarence Jacobs understood that the defendant’s father was going to take the defendant to a person named “Ms. Snow” who would give the defendant advice, take care of him, and look out for his best interest to make sure the police did not get him.
It was Clarence’s further understanding that the defendant was meeting with Snow to clear his name, which was a good thing. Clarence Jacobs stated that he did not believe the woman was a police officer but rather some type of lawyer. He also believed that she would make certain the defendant had a lawyer, if he needed one.
Clarence Jacobs stated that he traveled that night to Harvey, Louisiana with the defendant (his nephew) and defendant’s father (Clarence’s brother). They left his home in Mississippi at 9:00 PM and arrived in Harvey around 12:00 AM. Clarence Jacobs believed that he was taking the defendant to a juvenile center, not a police station. Clarence further stated that, when Lt. Snow greeted them, she assured them that the defendant was falsely accused, and was now in good hands. Clarence understood that Lt. Snow would do what was best for the defendant, including speaking to a judge. Clarence Jacobs felt that the woman was their |B9friend. He claimed that Snow told the defendant all he had to do was tell his side of the story. Clarence Jacobs remembered that the defendant was quite sleepy at the time.
At the suppression hearing, the defense also called Dr. Mark Zimmerman, a licensed psychologist as an expert in forensic psychology and forensic neuropsycholo-gy. He testified that the adolescent brain is different from the adult brain and that the adolescent engages in very concrete thinking rather than abstract thinking. He opined that Miranda rights are abstract so a person must have the ability to think abstractly to understand those rights.
*584 Dr. Zimmerman stated that he tested the defendant in 1998. Among other things, he assessed his cognitive and neu-ropsychological functioning. His IQ was 83, which is within the range for mental retardation. Dr. Zimmerman also testified that defendant suffers with a type of brain dysfunction that made his ability to understand his rights more difficult so Dr. Zimmerman opined that it was highly unlikely that Jacobs understood his rights. He also admitted that he was not present that night so he could not definitively testify that defendant did not understand his rights.
In reviewing a trial court’s ruling as to the admissibility of a confession, the court’s conclusions on the credibility of witnesses are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Barton, 02-163, p. 14 (La.App. 5 Cir. 9/30/03), 857 So.2d 1189, 1199-1200, writ denied, 03-3012 (La.2/20/04), 866 So.2d 817. A trial court’s ruling will not be overturned on appeal unless it is unsupported by the evidence. Barton, 02-163 at 14, 857 So.2d at 1200.
In this case, Lt. Snow testified that defendant was advised of his Miranda rights, did not at any time ask for an attorney, nor indicate that he did not want to [7ntalk to the officers. The credibility of witnesses at a suppression hearing is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. Based on the evidence, if we were to reach the merits, we would find no abuse of the trial court’s discretion in finding Lt. Snow’s testimony more credible in this respect.
State v. Keller, 09-403 (La.App. 5 Cir. 12/29/09), 30 So.3d 919, 930.
In his tenth assignment of error, defendant contends that the State’s reliance on unreliable scientific evidence violates due process. Specifically, defendant complains that ballistics expert Louise Walzer’s testimony was prejudicial and irrelevant, because it was not based in scientific methods, but on subjective beliefs and unsupported speculation. The State points out that this Court rejected this claim on writs prior to trial.
On December 6, 2002, defendant filed in the trial court a “Daubert Motion to Limit Testimony Concerning Ballistics.” On January 27, 2003, the parties argued the motion, and the defense moved the court to set the motion for a hearing. Citing his familiarity with the field of ballistics and with the qualifications of the State’s witness, Ms. Walzer, the judge denied the motion without a hearing.
Defendant applied for writs to this Court from the trial court’s ruling, arguing that Ms. Walzer’s testimony should be excluded at trial, and that he was entitled to a Daubert[40] hearing. This Court granted the writ in part, remanding the case for a Daubert hearing. This Court denied the writ in part on the issue of admissibility, because a determination could not be made regarding the exclusion of Ms. Walzer’s testimony prior to the Daubert hearing. State v. Jacobs, 03-395 (La.App. 5 Cir. 5/6/03) (unpublished writ).
17IIn accordance with this Court’s ruling, the trial court held a Daubert hearing on May 12, 2005. Ms. Walzer was the only witness called. She testified that she is an assistant lab director with the Jefferson Parish Sheriffs Office. She has been a *585 firearms examiner since 1976. Since 1980 she has been qualified as an expert in ballistics testing in hundreds of court proceedings. She has never had a court reject her expert qualifications. She was qualified as an expert at defendant’s first murder trial.
Ms. Walzer testified that the crime lab follows the rules established by the Association of Firearm and Toolmark Examiners (AFTE). The theories and techniques the crime lab uses are subject to publication and peer review. The methodology the lab employs is accepted in the scientific community as valid and reliable. She is required to keep up with publications in her field in order to maintain the most current standards in the lab. In the lab, the examiners use a “buddy system” to check each other’s work for accuracy. Based on the efficiency tests her lab routinely undergoes, its rate of error is 1.4 percent.
Ms. Walzer testified that as a firearms examiner, she studies projectiles or their fired cartridge casings using forms of the scientific method. In the instant case, she received three bullets and a .9 millimeter caliber casing. Using the scientific method, she: 1) identified the problem (what she would do with the three projectiles), and 2) developed a hypothesis (whether she would be able to determine the calibers of the projectiles, and whether the specimens would match each other). Ms. Walzer then used deductive reasoning and analysis, and she performed macro and microscopic examinations of the specimens.
Ms. Walzer testified that she places the evidence she examines into four categories: identify, eliminate, inconclusive, unsuitable. Based on her testing, Ms. Walzer determined the three bullets were all made of a lead alloy and that they all 172belonged to the .38 caliber class (which includes .9 millimeter, .380, .357, .38 super auto, and .357 signature). She also determined that, based on their characteristics, the three bullets were consistent with having been fired from a revolver. Beyond that, Ms. Walzer’s testing was inconclusive.
One of the bullets was too damaged to allow her to determine anything beyond the fact that it was .38 caliber class and it was fired from a revolver. The other two bullets were damaged too, but they showed some of the markings from the gun barrel. Still, there were not enough markings on those two bullets to allow her to determine anything more specific about them than their caliber.
On cross-examination, Ms. Walzer testified she was unable to determine whether all of the bullets came from the same weapon. She could say that none of the bullets were fired from a .32 or .22 caliber gun.
After hearing Ms. Walzer’s testimony and the arguments of counsel, the trial court denied defendant’s motion. Defendant filed a writ application to this Court, arguing that the trial court erred in allowing the State to present Ms. Walzer’s testimony, which the defendant said consisted only of conjecture. Defendant did not challenge the scientific validity of the ballistics evidence; rather, he argued that Ms. Walzer’s testimony was inadmissible because it was irrelevant and prejudicial. Specifically, defendant complained that Ms. Walzer’s testimony suggested there was more than one gun involved in the murders, evidence he said was prejudicial to his defense. Defendant included the motion hearing transcript in his writ application.
This Court denied the writ, reasoning, in part:
The defendant does not challenge the qualifications of Ms. Walzer or her scientific method. As to relevance, we *586 find, as did the trial judge, that Walzer’s testimony does assist the court in understanding the evidence regarding the general characteristics of the bullets and 1TOcasings and what conclusions can be reasonably drawn from the scientific analysis performed.
Therefore, we find that the trial court did not abuse its discretion in determining the testimony of forensic expert, Louise Walzer, was both relevant and reliable.
State v. Jacobs, 05-563 (La.App. 5 Cir. 6/16/05) (unpublished writ). Defendant filed a writ application in the Louisiana Supreme Court, challenging this Court’s ruling. The supreme court denied the writ. State v. Jacobs, 05-1896 (La.1/27/06), 922 So.2d 557.
Ms. Walzer testified for the State at trial. The trial court accepted her as an expert in firearms examination. Ms. Wal-zer explained that the barrel of a gun has grooves and imperfections that make distinctive markings (striations) on a bullet when it is fired. In this case, all three bullets she examined were too damaged for her to make a determination as to whether they were fired from the same weapon.
Ms. Walzer identified State’s Exhibit 12 as a lead alloy bullet she obtained from Dr. Susan Garcia. Ms. Walzer identified State’s Exhibit 13 as a second lead alloy bullet obtained from Dr. Garcia. Ms. Wal-zer noted that the top part of the bullet had “mushroomed,” i.e., separated, from hitting something harder than itself. She stated that bullets can mushroom when they hit solid surfaces like wood, concrete, or a human body. Ms. Walzer testified that State’s Exhibit 70 was removed from the wall of the master bedroom in the victims’ house.
Ms. Walzer stated that she uses a compound microscope to examine the specimens she receives. Of the three bullets she examined in this case, State’s Exhibit 13 was in the best condition. She was able to determine that it was consistent with a .38 caliber class, and that it was fired from a revolver. A .38 caliber class ammunition can be used in several types of weapons, including .9 |74millimeters, ,38s, and .357s. The defense did not cross-examine Ms. Walzer at trial.
Defendant now complains that Ms. Wal-zer’s trial testimony failed the second prong of the Daubert test. He argues that her testimony that the three bullets in evidence could have all been fired from different weapons was unsupported conjecture.
This Court performed a thorough review of this issue in addressing defendant’s second writ application. Ms. Walzer’s trial testimony was not substantially different from the testimony she gave at the motion hearing. On appeal, defendant has produced no new arguments or evidence to show that the prior disposition of this Court was patently erroneous. For the foregoing reasons, we decline to review this argument in accordance with the “law of the case” doctrine. See State v. Johnson, 06-859 at 12, 957 So.2d at 840.
Even if we were to reach the merits of this issue, defendant’s argument has little merit. La. C.E. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., supra, the United States Supreme Court set forth the following factors to be considered in determining the relia *587 bility of expert testimony: 1) whether the theory or technique has been subjected to peer review and/or publication, 2) the known or potential rate of error, 8) the testability of the theory or technique, and 4) whether the methodology is generally accepted in the scientific community. In State v. Foret, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test for reliability of expert 17fiscientific testimony set forth in Daubert as a guide to determining the admissibility of expert testimony under Article 702.
In Foret, the Louisiana Supreme Court stated that the trial court was “to act in a ‘gatekeeping’ function to ‘ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.’” Foret, 628 So.2d at 1122 (citing Daubert, supra). The Foret court explained that “[t]he reliability of expert testimony is to be ensured by a requirement that there be a “valid scientific connection to the pertinent inquiry as a precondition to admissibility.’” The Foret court further stated, “[t]his connection is to be examined in light of ‘a preliminary assessment’ by the trial court ‘of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.’ ” Id. (citing Daubert, supra).
Here, all of the Daubert criteria were satisfied with regard to Ms. Walzer’s testimony. At the motion hearing, she testified that the work she does at the crime lab is subject to peer review. She also testified to the rate of error inherent in her work, and the fact that she follows the guidelines established by the AFTE. It was clear from Ms. Walzer’s testimony that the methods used in the Jefferson Parish crime lab are those widely accepted in her profession. This assignment lacks merit.
In his eleventh assignment of error, defendant argues that “defects in the Grand and Petit Jury pool violated the Constitution.” Specifically, defendant argues that the Jefferson Parish grand and petit jury venires were unconstitutionally constituted. He contends the jury pool was unconstitutional for three reasons: 1) African-Americans were underrepresented, 2) certain professions were excluded, and 3) persons 16 and 17 years old were excluded.
17iiWith respect to defendant’s contention that the grand jury was unconstitutional because African-Americans were underrepresented, defendant did not raise this issue in this case in the lower court. This Court has appellate and supervisory jurisdiction over rulings made by the district courts within our circuit. La. Const. Art. 5, § 10. The Courts of Appeal will review only issues, which were submitted to the trial court, and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise. U.R.C.A. Rule 1-3. We find that the issue of racial composition of the grand and petit juries in Jefferson Parish was not raised nor ruled on in the lower court and, thus, is not before this Court on appeal.
Furthermore, even if this issue had been raised in the lower court, pursuant to Rule 2-12.4 of the Uniform Rules, Courts of Appeal, all specifications or assignments of error must be briefed, and the appellate court may consider as abandoned any specification or assignment of error that has not been briefed. Restating an assigned error in brief without including argument or citation of authority does not constitute briefing. State v. Lauff, 06-717, p. 9 (La.App. 5 Cir. 2/13/07), 953 So.2d 813, 819. Here, defendant did not brief this issue and, thus, this issue is abandoned.
*588 With respect to defendant s contention that the grand jury was unconstitutional because certain professionals were exempted, defendant did not raise this issue in this case in the lower court.[41] This Court has appellate and supervisory jurisdiction over rulings made by the district courts within our circuit. La. Const. Art. 5, § 10. The Courts of Appeal will review only issues, which were |77submitted to the trial court, and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise. U.R.C.A. Rule 1-3. We find that, in this case, this issue was not raised nor ruled on in the lower court and, thus, is not before this Court on appeal.
Furthermore, even if this issue had been raised in the lower court, pursuant to Rule 2-12.4 of the Uniform Rules, Courts of Appeal, all specifications or assignments of error must be briefed, and the appellate court may consider as abandoned any specification or assignment of error that has not been briefed. Restating an assigned error in brief without including argument or citation of authority does not constitute briefing. State v. Lauff, supra. Here, defendant did not brief this issue and, thus, this issue is abandoned.
Finally, with respect to defendant’s claim that the grand and petit juries were unconstitutionally composed because persons 16 and 17 years old were excluded, we note the following. In the district court, defendant moved to quash his indictment on the basis that the Jefferson Parish jury venires were unconstitutionally composed because they excluded persons that are 16 and 17 years old. The trial judge denied this motion and defendant sought supervisory review of that ruling in this Court.
This Court found that the trial judge did not err in denying' the motion to quash defendant’s indictment and provided the following:
In this case, we find the Defendant has failed to meet his burden of showing a constitutional violation. The United States Supreme Court recognizes the state’s broad discretion in enacting relevant juror qualifications so long as it may be fairly said that the jury lists or panels are representative of the community. The Louisiana Constitution provides the age of majority as a minimum age requirement for juror qualification. The legislature enacted the age of majority, 18, as the qualifying age and this enactment was not prohibited by the Louisiana Constitution. Sixteen and 17-year olds are not a cognizable or distinctive class for purposes of an equal protection or fair cross section constitutional violation.
State v. Jacobs, 04-916 (La.App. 5 Cir. 8/13/04) (unpublished writ disposition), writ denied, 04-2421 (La.12/10/04), 888 So.2d 842.
Because we find that the age composition issue was fully litigated in defendant’s pre-trial writs, and this Court’s prior ruling does not constitute “palpable former error,” we decline to review the matter on appeal under the “law of the case” doctrine. See State v. Johnson, 06-859 at 12, *589 957 So.2d at 840; State v. Hollimon, 04-1195, pp. 3-4 (La.App. 5 Cir. 3/29/05), 900 So.2d 999, 1000-01.
In his twelfth assignment of error, defendant contends that the State failed to meet its heavy burden to establish that the case had not prescribed. Specifically, defendant argues that the State failed to bear its burden under State v. Groth, 483 So.2d 596, 599 (La.1986), to show that the case has not prescribed, and asserts that the case should have been remanded with orders that the State establish the interruption of the prescriptive period. The State responds that this Court correctly denied defendant’s prescription claim in a pre-trial writ, and that defendant’s filings thereafter continued to suspend the limitation period for the commencement of trial.
On May 13, 2005, the trial judge denied defendant’s motion to quash the indictment. Defendant applied for review to this Court, which denied defendant’s writ application on this issue. State v. Jacobs, 05-562 (La.App. 5 Cir. 6/16/05) (unpublished writ), writ denied, 05-1830 (La.1/27/06), 922 So.2d 553. This Court reasoned, in pertinent part:
Since the new indictment was filed, relator has filed a plethora of motions in the trial court and writ applications with this Court.
Ultimately, relator filed a motion to quash the indictment in the trial [court], claiming the time delay for commencement of trial from the grant of the new trial exceeded the requisite one-year period.
In support of his motion in the trial court, Relator asserted the rules governing new trials only provide for interruption rather than suspension. In his application to this Court, relator also argues that, in 179the alternative, if suspension applies, the State failed to meet its burden of proving the period was suspended.
We find the relator’s argument unpersuasive. Grounds for suspension under La.C.Cr.P. art. 580 also apply to the time limits specified by La.C.Cr.P. art. 582 after either a new trial or a mistrial has been granted. State v. Brooks, 02-792 (La.2/14/03), 838 So.2d 778, 782. Thus, relator’s assertion that interruption only applies is without merit.
Further, given the number of motions filed by relator before the expiration of the new date, and the fact that relator currently has a writ pending in the Louisiana Supreme Court (04-2738), we find the State has met its heavy burden to show that the actions of relator justify an apparently untimely commencement of trial on grounds that the time limits were either interrupted or suspended. State v. Joseph, 93-2734 (La.6/3/94), 637 So.2d 1032.
Again, we find that this issue was fully litigated in defendant’s pre-trial writ, and this Court’s prior ruling does not constitute “palpable former error.” Thus, we decline to review the matter on appeal under the “law of the case” doctrine.[42]
In his thirteenth assignment of error, defendant argues that the Grand Jury indictment failed to allege all necessary elements. Specifically, defendant argues that the indictment was insufficient because it failed to allege the elements of second degree murder and indicate whether defendant was charged with felony murder or specific intent murder. The State responds that defendant was charged properly in a short form indictment, and that defendant was aware of the nature of the charges against him because he had *590 the record of his first-trial and the benefit of pre-trial discovery.
La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. When short forms are used, it is intended that a defendant may procure further details as to the statutory method by which he committed the offense through a bill of particulars. State v. Parker, 04-1017, p. 7 (La.App. 5 Cir. 3/29/05), 901 So.2d 513, 519, writ denied, 05-1451 (La.1/13/06), 920 So.2d 235 (citing State v. Richthofen, 01-500, pp. 35-36 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, 193). The test to determine the sufficiency of the indictment is whether it is misleading to the defendant. Richthofen, 01-500 at 35, 803 So.2d at 192.
La.C.Cr.P. art. 465(A)(31) provides the short form for first degree murder: “A.B. committed first degree murder of C.D.” The indictment in the present case states that “Lawrence Jacobs, Jr.” on October 31, 1996 “violated R.S. 14:30 in that he did commit first degree murder of Nelson Beaugh and Della Beaugh.” Defendant was accordingly charged in compliance with La.C.Cr.P. art. 465(A)(31).
Defendant further claims that the indictment was insufficient because it failed to indicate, after the State amended the indictment to second degree murder, whether he was charged under the felony murder disjunctive of La. R.S. 14:30.1 or under the specific intent disjunctive.[43] In the present case, defendant inquired as to the theory on which the State would proceed and, on August 17, 2006, the State informed defendant that it would proceed on both theories: specific intent and felony murder. The State also provided defendant with open file discovery.
In State v. Cedrington, 98-253, pp. 11-12 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 572, writs denied, 99-0190 (La.6/4/99), 743 So.2d 1249 and 99-0431 (La.6/25/99), 745 So.2d 1182, the defendant complained that the indictment and the subsequent answers to the bill of particulars did not sufficiently inform him of the nature of the charge when he had been originally charged with first degree murder, but the district attorney thereafter amended the charge to second degree murder. Although the indictment tracked the short forms of La.C.Cr.P. art. 465, it did not state under which subsection of La. R.S. 14:30.1 the defendant had been charged. Cedrington, 98-253 at 12-13, 725 So.2d at 572.
|R1In concluding that the defendant received fair notice of the charged offense prior to trial, this Court noted that the State provided the defendant with open file discovery and answered the bill of particulars, and that the evidence presented at trial was made available to the defendant prior to the trial. Cedrington, 98-253 at 13-14, 725 So.2d at 573. Furthermore, in State v. Pyke, 95-919, pp. 2-3 (La.App. 3 Cir. 3/6/96), 670 So.2d 713, 714-15, the Third Circuit appears to consider the fact that the defendant was being retried as relevant to the inquiry of whether an indictment is misleading.
Here, defendant was similarly retried. We find sufficient support in the record that defendant was aware of the nature of the charges against him. See also, State v. Page, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, writ denied, 09-2684 (La.6/4/10), 38 So.3d 299.
Finally, defendant contends that the indictment runs afoul of Jones v. United States, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224, 143 L.Ed.2d 311 (1999), which *591 requires that any fact, other than prior conviction, that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Defendant’s reliance on Jones is misplaced.
In this case, the mandatory penalty for second degree murder is a life sentence without parole, probation, or suspension of sentence. Since the sentence is mandatory, there is no fact that can “increase the maximum penalty” for La. R.S. 14:30.1. Thus, the State was under no duty to charge facts in the indictment. Defendant’s argument lacks merit.
In his fourteenth assignment of error, defendant argues that the trial court erred in denying Appellant’s Motion to Quash La. C. Cr. P. Art. 782 as | ^unconstitutional.[44] Defendant argues that La.C.Cr.P. art. 782(A), which permits non-unanimous verdicts in non-capital felony cases, is unconstitutional, quoting Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S.Ct. 2348, 2356, 147 L.Ed.2d 435 (2000), for the proposition that any charged offense must be “confirmed by the unanimous suffrage of twelve [jurors].”[45] (Emphasis omitted). Defendant argued this motion prior to trial, and the trial court denied it.
The State responds that La.C.Cr.P. art. 782 has consistently been upheld as constitutional. Further, defendant has no standing to raise this issue because defendant was convicted by unanimous verdicts on both counts.
In Burch v. Louisiana, 441 U.S. 130, 132, 99 S.Ct. 1623, 1624, 60 L.Ed.2d 96 (1979), the defendant was convicted of obscenity under La. R.S. 14:106 by a non-unanimous 5-1 jury verdict, whereas the co-defendant was convicted of obscenity by a unanimous six-person jury verdict. The Supreme Court ruled that, because the co-defendant “was convicted by a unanimous six-person jury, [the co-defendant] lacks standing to challenge the constitutionality of the provisions of Louisiana law allowing conviction by a nonunanimous six-member jury.” Burch, 441 U.S. at 132 n. 4, 99 S.Ct. at 1624. Because defendant in this case was convicted by unanimous verdicts on each count, he lacks standing to challenge the constitutionality of La.C.Cr.P. art. 782(A).
Furthermore, even if defendant had standing to challenge this statute, the Louisiana Supreme Court has long held that non-unanimous jury verdicts for twelve-person juries are not unconstitutional in non-capital cases. State v. Edwards, 420 So.2d 663, 674 (La.1982). In State v. Belgard, 410 So.2d 720, 726 (La.1982), the Louisiana Supreme Court explained that the United States Supreme Court upheld the validity of non-unanimous jury verdicts for twelve-person juries,[46] and that “[t]his court has consistently held C.Cr.P. 782 does not violate the Sixth or Fourteenth Amendments to the United States Constitution.”
Finally, in State v. Bertrand, 08-2215 (La.3/17/09), 6 So.3d 738, the Louisiana *592 Supreme Court recently reversed a district court ruling that La.C.Cr.P. art. 782 was unconstitutional. The Bertrand court noted:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Id., 08-2215 at 8, 6 So.3d at 743. This assignment of error lacks merit.
In his fifteenth assignment of error, defendant argues that consecutive life sentences for a Sixteen Year-Old offender convicted of second degree murder violates the Eighth Amendment. Specifically, defendant challenges the constitutionality of his two consecutive life sentences without parole.
He argues that a life sentence without the possibility of parole for a non-shooting defendant who was 16 years old at the time of the offense violates the Eighth Amendment of the United States Constitution, the Louisiana Constitution, and international law. He further argues that the sentence violates the equal protection clauses of the state and federal constitutions because the system sentencing 16-year-olds to life imprisonment is racially discriminatory.
The State responds that defendant offers no statutory or jurisprudential support for his claims. Furthermore, defendant’s sentences are not excessive.
[S4The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. State v. Nguyen, 06-969, p. 5 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, 64, writ denied, 07-1161 (La.12/7/07), 969 So.2d 628. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering. Nguyen, 06-969 at 5-6, 958 So.2d at 64.
Further, according to La.C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice, while recognizing the trial court’s wide discretion. Nguyen, 06-969 at 6, 958 So.2d at 64.
In the present case, after defendant was sentenced, he objected to the sentence “under the Louisiana Constitution, specifically the 8th Amendment of the U.S. Constitution and Article 1, Section 20 of the Louisiana Constitution.” Thereafter, defendant filed a written motion to reconsider sentence on November 3, 2006. Defendant’s motion to reconsider sentence was denied on March 11, 2008.
In defendant’s motion to reconsider sentence, he argued his sentence was excessive because he was 16 years old at the time of the offense and played a lesser role in the offense. He also argued for a downward deviation in his sentence under Dorthey. *593 [47]
First, we note that defendant challenges the constitutionality of the imposition of consecutive sentences because he was a “non-shooting defendant” | ffiwho was 16 years old at the time of the offense. We can find no evidence in the record before us that defendant has raised this claim in the trial court.
This Court has recognized that when the consecutive nature of sentences is not specifically raised in the trial court, then the issue is not included in the bare constitutional excessive review and the defendant is precluded from raising the issue on appeal. See State v. Williams, 10-265 (La.App. 5 Cir. 11/9/10), 54 So.3d 98; State v. Jones, 09-688 (La.App. 5 Cir. 2/9/10), 33 So.3d 306, 322 n. 5. Accordingly, we will not address the imposition of consecutive sentences.
Moving to defendant’s claim that his life sentence is excessive, we reiterate that second degree murder carries a mandatory life sentence. La. R..S. 14:30.1. A mandatory minimum sentence is presumed constitutional. State v. Royal, 03-439, p. 12 (La.App. 5 Cir. 9/30/03), 857 So.2d 1167, 1174, writ denied, 03-3172 (La.3/19/04), 869 So.2d 849.
Further, Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. See State v. Lovick, 00-1833, p. 15 (La.App. 5 Cir. 5/16/01), 788 So.2d 565, 573, writ denied, 01-1836 (La.5/10/02), 815 So.2d 833, and cases cited therein. In State v. Hill, 98-1087, p. 15 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 698-99, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, this Court recognized that “[t]he contention that a mandatory life sentence for second-degree murder is a violation of the constitutional prohibition against excessive punishment has been repeatedly rejected, even when the offender is a juvenile.”[48]
Nonetheless, a trial court may reduce a presumptively constitutional sentence if it determines the sentence makes no “measurable contribution to 18r,acceptable goals of punishment” or that the sentence amounts to nothing more than “the purposeful imposition of pain and suffering” and is “grossly out of proportion to the severity of the crime” as applied to a particular defendant. State v. Dorthey, 623 So.2d 1276, 1280-81 (La.1993).[49] A court may only depart from the mandatory sentence if it finds clear and convincing evidence that would rebut the presumption of constitutionality. State v. Johnson, 97-1906, p. 7 (La.3/4/98), 709 So.2d 672, 676. Downward departures from mandatory sentences should only occur in rare cases. State v. Berniard, 03-484, p. 12 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 75, writ denied, 03-3210 (La.3/26/04), 871 So.2d 345.
When a defendant seeks a downward deviation from the mandatory sentence, he has the burden to rebut the *594 presumption of constitutionality by showing by clear and convincing evidence that he is exceptional, namely that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. Berniard, 03-484 at 13, 860 So.2d at 75. A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130.
In this case, defendant argued for a downward departure under Dorthey in his motion to reconsider sentence. In that motion, he argued that his youth and his lesser role in the offense made his sentences unconstitutionally excessive. On [ 87appeal, defendant again argues that he was a “non-shooting defendant” who was 16 years old at the time of the offense.
A defendant’s young age alone does not provide sufficient grounds to deviate downward from a mandatory life sentence. See State v. Kirkland, 01-425, p. 12 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 271, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415 (where this Court noted that defendant’s young age of 17 alone did not appear to provide sufficient grounds to deviate downward from a mandatory life sentence). Further, although defendant claims he was a “non-shooting defendant,” the evidence presented in this case does not necessarily support this claim. At trial, the evidence was not conclusive as to the identity of the shooter or shooters.
Moreover, in State v. Hill, 98-1087 at 10, 742 So.2d at 696-97, this Court upheld the defendant’s second degree murder conviction, even though the trial testimony indicated the defendant was probably not the shooter. This Court also found that a life sentence for this defendant was not excessive. Hill, 98-1087 at 15, 742 So.2d at 698-99.
Upon review, we find that defendant failed to clearly and convincingly show that, because of unusual circumstances, he was a victim of the legislature’s failure to assign sentences that were meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the ease. There was, thus, no support for a downward deviation from the mandatory sentence of life imprisonment. Further, we find that the sentences imposed were not unconstitutionally excessive and not grossly disproportionate to the severity of the offenses.
Finally, defendant argues that his life sentences without parole are unconstitutional per se due to his age at the time the offense was committed. Defendant also argues on appeal that the system sentencing 16-year-olds to life | ^imprisonment is “racially discriminatory.” In brief, defendant presents two eonclusory sentences with no authority to his claim. We deem this argument as abandoned. See U.C.R.A. 2-12.4; State v. Lauff, 06-717 at 9, 953 So.2d at 819.
Even if we reached the merits, we note that a similar argument was rejected by our brethren on the First Circuit in State v. Craig, 05-2323, pp. 4-9 (La.App. 1 Cir. 10/25/06), 944 So.2d 660, 662-65, writ denied, 06-2782 (La.6/29/07), 959 So.2d 518, cert. denied, 552 U.S. 1062, 128 S.Ct. 714, 169 L.Ed.2d 554 (2007). In Craig, the defendant argued that the trial court erred in denying his motion to reconsider sentence because his sentence violated the United States and Louisiana Constitutions. He argued that “[t]he principles underlying the decision in Roper v. Simmons, *595 bolstered by continuing scientific research and the great weight of international law, point to the illegality of the juvenile life without parole sentence under the Eighth Amendment.”[50]
In Craig, 05-2823 at 9, 944 So.2d at 664-65, the First Circuit rejected this argument because the imposition of a mandatory sentence does not violate the Eighth Amendment to the U.S. Constitution. Craig, 05-2323 at 5, 944 So.2d at 662. Further, the court recognized that Roper did not support the defendant’s position, because Roper only addressed the constitutionality of the imposition of the death penalty on offenders who were under 18 years of age when they committed the punishable offense.
Although Roper did not specifically address the constitutionality of life imprisonment for juvenile offenders, the Roper court affirmed the defendant’s sentence of “life imprisonment without eligibility for probation, parole, or release except by act of the Governor.” Id. (quoting Roper, 543 U.S. at 560, 125 S.Ct. at 1189-90). Based on the foregoing, even if we did not find that this argument was abandoned, it would lack merit.
In his sixteenth and final assignment of error, defendant argues that the district court did not have proper jurisdiction over the case.[51] He argues that the lack of individualized consideration under La. Ch.C. art. 305 violates the Eighth Amendment of the United States Constitution, citing generally to Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).[52] The State responds that this claim has been previously decided against defendant, and that the district court was properly vested with jurisdiction.
First, defendant challenged his indictment in the district court. On June 1, 2004, defendant moved to quash his indictment because La. Ch.C. art. 305(A) was not the proper mechanism to charge him with capital murder. The motion to quash was denied on August 5, 2004. Thereafter, defendant sought supervisory review, which was denied by this Court. State v. Jacobs, 04-1020 (La.App. 5 Cir. 10/7/04) (unpublished writ), writ denied, 04-2738 (La.6/17/05), 904 So.2d 712.
In that writ application, defendant argued that La. Ch.C. art. 305(A) violates the Eighth Amendment of the U.S. Constitution because it renders juveniles eligible for the death penalty without individualized consideration. The unpublished writ disposition states that Article 305(A) automatically waives juvenile court jurisdiction for first degree murder.[53]
Later, after the State amended the indictment, defendant filed a supplemental motion to quash jurisdiction. The trial court denied this motion on May 13, 2005. Defendant’s supplemental motion to quash argued that the indictment was issued | flntoo late to confer district court jurisdiction, and that his transfer to district court was unconstitutional because there was no individualized consideration of his circum *596 stances. Defendant did not seek supervisory review of the denial of his supplemental motion but challenges that ruling on appeal.
La. Ch.C. art. 303 gives juvenile courts exclusive jurisdiction over children except where the child is subject to the jurisdiction of the criminal courts under the provisions of La. Ch.C. art. 305 et seq., or has been transferred by the juvenile court for criminal prosecution as an adult under La. Ch.C. art. 857 et seq. La. Ch.C. art. 305(A) provides that children age 15 and older accused of certain enumerated offenses are subject to the exclusive jurisdiction of the juvenile court until either an indictment charging one of the enumerated offenses is returned, or the juvenile court holds a continued custody hearing and finds probable cause that the child has committed one of the enumerated offenses.
First degree murder is an enumerated offense under La. Ch.C. art. 305(A)(1). In defendant’s case, therefore, exclusive jurisdiction vested in the district court by operation of law when the grand jury issued its indictments in 1996 and 2002. See State v. Jacobs, 04-1219, p. 14 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, 92, writ denied, 05-2072 (La.4/28/06), 927 So.2d 282, cert. denied, 549 U.S. 956, 127 S.Ct. 385, 166 L.Ed.2d 276 (2006) (citing State v. Washington, 00-1055, p. 8 (La.App. 4 Cir. 7/18/01), 793 So.2d 376, 382). Accordingly, this assignment lacks merit.
In sum, we have addressed each of the arguments, except those addressed in previous opinions or by the Louisiana Supreme Court, that defendant raised in his original brief. We now move to the arguments presented to this Court in supplemental briefs filed after this matter was originally submitted on May 5, 2008.
|;),On May 19, 2008, with leave of this Court, defendant filed his post-argument brief, raising two assignments of error: (1) the appellate record is incomplete; and (2) the lack of “properly endorsed” indictment is structural error. Defendant argues that the record does not contain evidence of a valid indictment, which deprives this Court of jurisdiction to review this matter and requires reversal of his convictions.
The State responded that defendant’s assertion that the record did not contain the indictment upon which the case was issued was incorrect. The State explained that the record contained two first degree murder indictments — the 1996 original indictment, which was later amended to second degree murder, and the 2002 indictment. The State argued that any irregularity in the amendment of the instant indictment did not form a basis for concluding that any error was reversible.
On review, we find that the appellate record contains “properly endorsed” documentation that, on September 12, 2002, the Jefferson Parish grand jury indicted defendant for first degree murder for the homicides of Della Beaugh and Nelson Beaugh. Thus, there is no merit to this claim.
On March 27, 2009, defendant filed a pro se supplemental appellate brief, raising two assignments of error: (1) trial Court erred in proceeding with the trial when no valid indictment had been filed; and (2) there is no “codal authorization for the prosecutor to amend an indictment; The judge in duty must not create and exercise functions of the legislature, but only to interpret law, as binding on him by the Constitution and 1974 Louisiana Constitution Art. I & 15.” Defendant argued that he was arraigned, tried, convicted, and sentenced on a non-existent charge of second degree murder, noting that an oral indictment is no indictment at all. He further argued that the State did not have *597 the authority to amend the indictment and | aato institute prosecution of second degree murder with a bill of information. He concluded that this error patent required a reversal of his conviction.
First, as noted above, the defendant’s 2006 prosecution was instituted by a valid indictment by the grand jury charging defendant with first degree murder.[54] Second, there is longstanding jurisprudential rule of law that a district attorney can amend a grand jury indictment. See, State v. Davis, 385 So.2d 193, 196 (La.1980); State v. Gilmore, 332 So.2d 789 (La.1976); State v. Bluain, 315 So.2d 749, 752 (La.1975); State v. Hubbard, 279 So.2d 177 (La.1973); State v. Fitzgerald, 248 La. 487, 179 So.2d 906 (1965). As noted in the Error Patent review, this is not a defect that affects the substantial rights of the accused and, thus, is not reversible error. La.C.Cr.P. art. 921.
In his third “Supplemental Brief’ filed on August 30, 2010 after this matter was remanded from the Louisiana Supreme Court, defendant assigned as error, “Appellant’s State and Federal Rights to a Grand Jury Indictment Free of Discrimination Were Violated in That He Was Either Tried Pursuant to an Indictment Infected by Race and Gender Discrimination or Prosecuted on a Null Indictment, or the Verdict in This Case Was Non-Responsive to the Indictment.” Defendant conceded that this argument was not raised in the original brief, but advised that it was raised by appellant in both pro se supplemental briefs and a counseled brief filed with this Court. He argued that he was prosecuted based upon an indictment infected by race and gender discrimination.
Additionally, defendant explained that after this Court’s reversal, defendant, pro se, filed a motion to quash the proceedings in the district court. Defendant explained that he had received a transcript of the reading of the indictment to the jury, which was not included in the original appellate record, and that this | ^transcript revealed the jury was charged pursuant to an amended version of the 1996 indictment, not the 2002 indictment. Defendant claimed the 1996 indictment that the State proceeded to trial on was infected with discrimination in the selection of the grand jury foreperson.
On September 20, 2010, the State filed its supplemental appellee brief. In it, the State explained that the Supreme Court expressed that the matter was remanded to this Court for issues raised by defendant on appeal and pretermitted in this Court’s original analysis. The State argued that defendant did argue in his original appeal that the indictment was flawed because the grand jury venire was illegally constituted because it underrepresented African-Americans. However, the State asserted that defendant did not allege or timely brief the arguments of a null indictment or the claim that the verdict was not responsive, and therefore, these two arguments subsequently raised were beyond the Supreme Court’s remand order and could not be considered by this Court. The State further argued that these two new issues were not raised in the trial court. The State argued there was no objection below, there was no ruling to review, and defendant was not prejudiced because he knew the indictment would be amended to second degree murder.
Regarding the subsequent motion to quash, the State claims that the district court did not have jurisdiction at the time the pro se motion to quash was filed in the district court on October 9, 2009. The *598 State concludes that the amended indictment gave fair notice and set forth identifiable offenses.
First, we will address only the defendant’s arguments that have not already been analyzed in this opinion. Second, to the extent that defendant challenges his indictment on any basis that has not been raised in the trial court, there is no ruling 194for this Court to review. See, U.R.C.A. 1-3 (Courts of Appeal review only those issues which were submitted to the trial court).
Third, although defendant raises the claim that the verdict was non-responsive to the indictment, he fails to support this argument with statutory or jurisprudential authority. Further, pursuant to La. C.Cr.P. art. 814(A)(1) and 814(A)(3), the jury’s verdict, which was guilty of two counts of second degree murder, is responsive to an indictment of either first degree or second degree murder. These claims lack merit.
Thereafter, on October 25, 2010, defendant filed another pro se supplemental brief, raising two errors: (1) Appellant’s State and Federal Rights to a Grand Jury Indictment were violated in that he was tried on an indictment that was null and void, and no indictment at all; and (2) Consecutive Life Sentences for a Sixteen year Old Offender Convicted of Second Degree Murder Violates the Eight [sic] Amendment.
With respect to assignment of error one, this claim was raised in his third supplement and addressed, supra. Further, any discussion regarding error patent with respect to the indictment, can be found in the error patent review, infra.
In his second assignment, defendant argues that his life sentence without parole is an absolute nullity because it “unconstitutionally legislates an unguided mandatory civil death, imposed under prohibited judicial discretion.” Defendant challenges the constitutionality of the sentencing provision of La. R.S. 14:30.1 because it does not give judicial discretion or alternatives in sentencing. Defendant does not indicate that this argument was raised before in the trial court. A constitutionality challenge to a statute cannot be raised for the first time on appeal; it must first be presented in the trial court. State v. Oliver, 03-416 (La.App. 5 Cir. 12/29/09), 30 So.3d 946, 951, writ denied, 10-271 (La.9/17/10), 45 So.3d 1041. Accordingly, we will not address the merits of this claim.

ERROR PATENT DISCUSSION

Finally, as required by La.C.Cr.P. art. 920, we have reviewed the record for errors patent. We have found the following errors that either required discussion or corrective action.
On its face, the substance of the indictment merits discussion for two reasons: (1) the 2002 indictment charged defendant with first degree murder of two victims but defendant was tried on two counts of second degree murder, and (2) the 2002 indictment could be read to charge defendant with only one count of first degree murder, rather than two.[55]
Defendant was initially indicted on two counts of first degree murder on December 5, 1996. On April 15, 1998, the State amended the indictment to dismiss count two of the indictment but to add Della Beaugh as a victim to the remaining count of first degree murder, i.e. one count with *599 two victims. However, defendant’s conviction on that charge was reversed by the Louisiana Supreme Court and the matter was remanded for a new trial. State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280.
On September 12, 2002, the Jefferson Parish Grand Jury issued a new indictment, charging defendant with first degree murder of Nelson Beaugh and Della Beaugh in a single count, i.e., one count with two victims.[56] Subsequently, during a hearing on May 12, 2005, the prosecutor stated that the State was proceeding to trial against defendant on charges of second degree murder.
|flfiOn May 18, 2005, another prosecutor made a handwritten amendment to the 1996 indictment, reducing the charges to second degree murder. Defendant was arraigned on the amended indictment on August 17, 2006, and pled not guilty.
Article I, § 15 of the Louisiana Constitution provides that “no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury.” Second degree murder is a crime punishable by life imprisonment, and is, therefore, one that must be instituted by a grand jury.
District attorneys are, however, empowered to amend grand jury indictments to charge lesser offenses. La.C.Cr.P. art. 487; State v. Davis, 385 So.2d 198, 196 (La.1980). An amendment of substance is properly allowed before trial. La.C.Cr.P. Art. 487.
Further, the State may abandon a charge for a lesser offense without the necessity of a formal indictment. State v. Edwards, 287 So.2d 518, 525 (La.1973) (citing State v. Doucet, 177 La. 63, 147 So. 500 (1933)). Second degree murder is a responsive verdict to first degree murder. Thus, the State in this case had the authority to reduce the charge without involving the grand jury.
Furthermore, the record reflects that, on August 17, 2006, defendant, through counsel, “waive[d] the reading of the bill of information and enter[ed] a plea to the amended charge of second-degree murder two counts, ... of not guilty_” At the very least, defense counsel knew that the State was trying defendant for two counts of second degree murder. Based on the foregoing, we find no error in the State abandoning the first degree murder charge and proceeding with its prosecution of second degree murder. See, State v. Domingue, 517 So.2d 346, 347 (La.App. 1 Cir.1987).
l97Next, in the 2002 grand jury indictment, the State listed both victims in one paragraph, without designating two separate counts. The record, however, reflects that defendant was tried, convicted, and sentenced on two separate counts of second degree murder. In State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), a grand jury indicted the defendant for the “first degree murder of one, Jamie Pitre and Kellie Pitts Sanders.” Id., 93-0001 at 12, 648 So.2d at 1283.
On the first day of trial, the prosecutor moved the court for leave to amend the indictment to charge the defendant with two separate counts of first degree murder. The Sanders court found that the indictment as originally written charged the defendant with two separate murders, and that the amendment had simply clari- *600 fled that there were two counts. The court characterized the amendment as a change in form rather than substance. Sanders, 93-0001 at 13, 648 So.2d at 1283.
Similarly, in the instant case, the charge that included both victims’ names can be considered as two separate counts. The record shows this was the understanding of both the State and the defense throughout the proceedings, since both sides repeatedly referred to two counts of murder.
Importantly, a post-verdict challenge to the sufficiency of an indictment does not provide grounds for setting aside a conviction unless the indictment failed to give fair notice of the offense charged, or failed to set forth any identifiable offense. State v. Cavazos, 610 So.2d 127 (La.1992) (per curiam); State v. Cedrington, 98-253, p. 11 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 572, writs denied, 99-0190 (La.6/4/99), 743 So.2d 1249, and 99-0431 (La.6/25/99), 745 So.2d 1182. Here, there are no grounds for setting aside defendant’s convictions, because the indictment in question gave fair notice of the offense charged and set forth identifiable offenses. Defendant clearly had notice prior to the [ ^commencement of trial that the State would be introducing evidence of two homicides, which were separate and distinct counts of second degree murder. Based on the foregoing, we find no corrective action is required.
The trial court also failed to advise defendant of the prescriptive period for post-conviction relief as provided in La.C.Cr.P. art. 930.8. By means of this opinion, we correct this error and inform defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. C.Cr.P. art. 914 or 922. State v. Thomas, 10-220 (La.App. 5 Cir. 11/9/10), 54 So.3d 678, 688.

CONVICTIONS AND SENTENCES AFFIRMED.

. In Roper v. Simmons, supra, the United States Supreme Court found that the Eighth Amendment to the United States Constitution, which prevents cruel and unusual punishment, precludes capital punishment for offenders who are under the age of eighteen when they commit their offense.

. For this Court to properly review defendant’s claim that the amended indictment caused reversible error, defendant supplemented the appellate record with the transcript of the reading of the indictment to the impaneled jury at the commencement of defendant's second trial on August 23, 2006. See error patent discussion, infra, regarding re-indictment and subsequent amendment.

. Before his trial, defendant sought supervisory review of many pre-trial rulings. He also challenges many of those same rulings on appeal as discussed, infra.

. State v. Jacobs (Jacobs II), 07-887 (La.App. 5 Cir. 5/12/09), 13 So.3d 677.

. State v. Jacobs (Jacobs III), 09-1304 (La.4/5/10), 32 So.3d 227 (per curiam) reh’g granted in part, 09-1304 (La.6/18/10), 37 So.3d 994 (per curiam).

. 559 U.S. —, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (per curiam), reh’g denied, — U.S. —, 130 S.Ct. 2141, 176 L.Ed.2d 758 (2010).

. Justice Johnson dissented in Jacobs III, since Thaler v. Haynes, supra, was peculiar in its facts as voir dire was presided over by two different judges, with one presiding over questioning of prospective jurors and a second presiding over the peremptory challenges and ruling on the proffered race-neutral reasons. In closing, Justice Johnson concluded that, where the prosecutor, through the use of peremptory challenges, has excluded “100% of the minorities from the jury, and there is evidence in the record of disparate treatment of similarly situates white and African-American prospective jurors, we need not accept any proffered race-neutral reasons that emphasize demeanor ... [because] [t]he prosecutor’s discriminatory intent is evident from the record.” Jacobs III, 09-1304 at p. 18, 32 So.3d at 238.

. Justice Weimer and Justice Johnson dissented in the per curiam's denial of rehearing in part.

. Because the second pro se supplemental brief he filed was not signed, defendant refiled the same pro se supplemental brief with his signature on October 28, 2010.

.Moreover, even if defendant did not have a firearm, he could have still been found to be a principal to the aggravated burglary. As recognized by the Louisiana Supreme Court, while possession of a dangerous weapon is an essential component of the commission of the aggravated burglary, a person may be a principal to the offense even though he did not personally have possession of the weapon used in the commission of the crime. See State v. Ortiz, 96-1609 at 14, 701 So.2d at 931 (citing State v. Dominick, 354 So.2d 1316 (La.1978)).

. La. R.S. 14:31(A)(2)(a) defines manslaughter as a homicide committed without any intent to cause death or great bodily harm "[w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person[.]”

. The jury was instructed only as to the responsive verdict of manslaughter while the perpetrator was engaged in a simple burglary of an inhabited dwelling.

. See also State v. Anderson, 97-1301 at 3, 707 So.2d at 1224-25, where the Louisiana Supreme Court stated, "[ajcting in concert, each man then became responsible not only for his own acts but for the acts of the other."

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Defendant contends the State used a total of nine peremptory strikes, seven of which were on non-white prospective jurors. Our review reflects that the State used eight peremptory strikes: Stevenson; Hawkins; Hughes; Laybum; Auzenne; Jordan; Florence; and Dillon. Of the eight jurors peremptorily struck by the prosecution, only one, Ms. Layburn, was non-minority. The remaining seven potential jurors were all minority. Lastly, at trial, the twelve-person jury was composed of eleven non-minority (Caucasian) jurors and one minority (African-American) juror. The sole minority juror was accepted at the end of the final venire panel.

.On appeal, defendant states that the trial judge erred in refusing to allow him to introduce evidence of "historical discrimination” before and during trial. First, defendant did not brief this issue so it is deemed abandoned. U.R.C.A. Rule 1-3; Rule 2-12.4. Second, defendant did not proffer the evidence that he sought to introduce so, even if this argument was briefed, we have nothing to review. Each of the other claims are addressed with respect to the prospective juror in question.

. On rehearing, the Louisiana Supreme Court remanded for consideration of "Batson issues not previously addressed by the court of appeal or ruled on by this Court in its per curiam opinion.” Jacobs III, 09-1304 at 1, 37 So.3d at 995.

. The prosecutor noted that the trial judge had initially indicated a challenge for cause was warranted but gave defense counsel an opportunity to rehabilitate her. The prosecutor admitted he should have perhaps re-urged his challenge for cause but felt Ms. Hawkins qualified for a peremptory challenge on the same basis.

. Defense counsel unsuccessfully challenged Mr. Vinturella for cause on this basis. She raises the denial of the challenge for cause on appeal in assignment of error number two, which is discussed infra.

.A review of the record fails to support defense counsel’s assertion that Mr. Arnold wanted defendant to testify. Mr. Arnold stated the police had to have probable cause to arrest the defendant but that his guilt depended on what the State presented.

. Defendant ultimately used peremptory challenges to exclude these four prospective jurors from the jury.

. La.C.Cr.P. art. 799 provides that a defendant, who is charged with an offense punishable by death or imprisonment at hard labor, is entitled to 12 peremptory challenges. The record reflects that defendant used all 12 of his peremptory challenges.

. See also United States v. Salamone, 800 F.2d 1216, 1226 (3rd Cir.1986), where the federal Third Circuit stated that "[a]bsent the requisite nexus — that the challenged affiliation will ‘prevent or substantially impair' a juror's impartiality — no juror may be excluded for cause on the basis of his or her membership in an organization that adheres to a particular view.”

. Additionally, when both the prosecutor and defense counsel reviewed the law regarding presumption of innocence and defendant’s Fifth Amendment right not to testify and collectively asked the jury panel if they had any problems with the law, Ms. Thouron never expressed any concerns or indicated she could not follow the law.

. An unidentified juror volunteered that defendant’s failure to testify would "leav[e] a cloud.” However, it appears that this unidentified juror was Mr. Mara because defense counsel later questioned and challenged him for cause based on this comment.

. See also State v. Mickel, 07-47, pp. 10-11 (La.App. 5 Cir. 5/29/07), 961 So.2d 516, 523-24, writ denied, 07-1422 (La.1/7/08), 973 So.2d 732, where this Court found no abuse of the trial court’s discretion in denying a challenge for cause of a prospective juror who admitted a "little seed of doubt” could remain in the “back of his mind" if the defendant did not testify. When asked if he would find the defendant guilty because he did not testify, the prospective juror replied he would not. This Court noted that the trial judge had explained to the jury panel that a defendant could rely on his presumption of innocence, had a right not to testify, and that no inference could be drawn by his failure to testify. This Court found none of.the jurors indicated they could not conscientiously apply the law or give the defendant a fair trial.

. 04-1312, pp. 30-35 (La.1/19/06), 921 So.2d 904, 929-32, cert. denied, 549 U.S. 858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006), overruled in part on other grounds by State v. Dunn, 07-0878 (La.1/25/08), 974 So.2d 658.

. See also State v. Gatti, 39,833, pp. 15-17 (La.App. 2 Cir. 10/13/05), 914 So.2d 74, 88-89, writ denied, 05-2394 (La.4/17/06), 926 So.2d 511, where the Second Circuit found no error in the denial of a challenge for cause of a prospective juror who stated that she thought the defendant was probably guilty because "he wouldn't be in court had [he] not done something wrong.” The court noted that the opinion the defendant had "done something wrong” was not equivalent with the opinion the defendant was guilty of the charged offense. The court concluded the prospective juror was exhaustively questioned and rehabilitated as an impartial juror who understood the presumption of innocence.

. Compare State v. Bozeman, 03-897, pp. 5-7 (La.App. 5 Cir. 1/27/04), 866 So.2d 1029, 1032-34, writ denied, 04-0497 (La.7/2/04), 877 So.2d 141, where this Court found reversible error when the trial court erroneously denied a challenge for cause of a prospective juror who indicated he probably could not afford defendant the presumption of innocence. This Court noted there was no rehabilitation by the trial judge or the prosecution.

. In its Motion, the State argued that Ben Cohen and Christine Lehmann were not qualified under the Louisiana Supreme Court Rules of Court or the Louisiana Standards on Indigent Defense to represent a defendant in a capital case. The State cited Supreme Court Rule XXXI(A)(l)(a), which provides:
*565 In any capital case in which a defendant is found to be indigent, the court shall appoint no less than two attorneys to represent the defendant. At least two of the appointed attorneys must be certified as qualified to serve in capital cases as provided below. The court shall designate one of the appointed attorneys to be lead counsel, the other(s) as associate counsel. The court shall only designate as lead and associate counsel those attorneys who have either been previously certified by the Louisiana Indigent Defender Board and whose certification is still in good standing or those attorneys who, after December 31, 1997, may be certified by the district court judge handling the case pursuant to Paragraph (b) of Subsection 1 of this Section.
Chapter Seven, Part III, Standard 7-3.1 of the Louisiana Standards on Indigent Defense provides that any associate trial counsel in a capital case “shall:”
(A) Be an experienced and active trial or appellate practitioner with at least three years of litigation experience; and
(B) Have prior experience as lead counsel in no fewer than three felony jury trials which were tried to completion, including service as lead or associate counsel in at least one homicide trial.
The State averred that Cohen and Lehmann had remained on the defense team—knowing that they were not qualified to do so—to create grounds for appeal.

. Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

. The admissibility of the rod photographs was discussed extensively before trial at hearings on December 6, 2002, April 4, 2006, and July 10, 2006, among other instances. At a hearing on July 10, 2006, defense counsel objected to the admissibility of five photographs, referred to as the "rod photographs,” as gruesome. The defense argued that the photographs had no relevance, did not reflect the crime that occurred, and had no probative value.
The State argued that the photographs were important to show the course and track of the bullets and how the victims were killed. The State further argued that no other photographs adequately illustrated the course and track of the bullets, which was necessary to support the State’s contention that there were at least two shooters.
Defense counsel argued that two rod photographs involving Della Beaugh were duplica-tive. The State responded that both photographs were needed to show the entrance and exit wounds. The court found both were admissible. Defense counsel objected to three rod photographs of Nelson Beaugh as well. The court found that two of the photos were admissible but denied admissibility of the third. Defense counsel noted objections to the introduction of any of the rod photographs.
Thereafter, the defense filed an application for supervisory review with this Court regarding the trial court’s ruling on admissibility of eight autopsy photographs, including three of the four rod photographs. The defense did not seek review of the admissibility of one of the rod photographs of Della Beaugh in that writ application. On August 22, 2006, this Court denied writs, finding that "the trial court did not abuse its discretion in finding the eight photographs admissible, at this time.” The Louisiana Supreme Court denied writs on August 23, 2006. State v. Jacobs, 06-2124 (La.8/23/06), 936 So.2d 808.

. According to the transcript of the April 4, 2006 pre-trial hearing, Dr. Garcia testified that it was often easier to display a wound with a photograph rather than just describing it verbally. She further provided the following:
I often find it quite helpful to have a photograph simply because, as an intermediary person trying to describe what I saw at autopsy, a photograph is often, to use the term, “worth a thousand words.” ... I can describe until I'm blue in the face a certain injury pattern but sometimes actually seeing a photographic representation of that wound is much more informative to a lay person than it is if I was talking to another group of forensic pathologists.
She did agree that she could show the course and track of the wounds in other ways besides showing the metal rod photographs to the jury; however, she stated that the photographs were helpful because the visual aspect was easier to convey to a lay person as compared to her verbal description.

. The police reports pertaining to the robbery, which were introduced at the hearing, show that the incident occurred at Stage’s business, located at 2404 Timbers Drive in Harvey, and that Stage resided at 2400 Timbers. The police reports are exhibits to the appellate record.

. McArthur is superseded by La. C.E. art. 412.2 only with respect to other crimes evidence of sexually assaultive behavior. See State v. Nguyen, 04-321, p. 10 (La.App. 5 Cir. 9/28/04), 888 So.2d 900, 907 n. 6, writ denied, 05-0220 (La.4/29/05), 901 So.2d 1064.

. In Bradshaw v. Stumpf, supra, Stumpf pled guilty to capital murder, although he claimed his co-defendant had actually been the shooter. The prosecution argued at the penalty phase that either Stumpf had shot the victim himself or that it didn’t matter who the shooter was under Ohio’s felony murder statute, which punished aiders and abettors equally as long as the aiding and abetting was done with the specific intent to cause death. Stumpf was ultimately sentenced to death. The State then tried Stumpf’s co-defendant, and based on new evidence obtained after Stumpf’s plea, attempted to show the co-defendant was the shooter. Based on what he alleged was pros-ecutorial inconsistency between his sentencing proceeding and the trial of his co-defendant, Stumpf attempted to withdraw his guilty plea. The Supreme Court rejected the argument, finding no major inconsistencies in the State’s arguments. The Bradshaw court opined that the prosecutor’s use of allegedly inconsistent theories may have a more direct effect on the defendant's sentence. But the high court concluded the issue was premature, since the court of appeals had not fully considered the issue.

. Dr. Sautter's report was not admitted in evidence at trial, but was included in the record as an attachment to defendant’s new trial motion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Also, in the middle of defendant's statement, his father asked Lt. Snow to stop the tape and she left the room. He spoke to his son again then called Lt. Snow back into the room. Thus, defendant and his father spoke privately on two occasions while they were at the detective bureau.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. In a previous unrelated case in which defendant was convicted of armed robbery, defendant raised this issue. State v. Jacobs, 04-1219 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, writ denied, 05-2072 (La.4/28/06) 927 So.2d 282, cert. denied, 549 U.S. 956, 127 S.Ct. 385, 166 L.Ed.2d 276 (2006). This Court found no merit in defendant’s argument that the grand jury venire was unconstitutionally composed because certain professionals were exempt from jury service. This Court concluded that defendant failed to meet his initial burden of showing a prima facie violation of the “fair cross-section” requirement of the Sixth Amendment. See Jacobs, 904 So.2d at 89-91.

. See State v. Johnson, 957 So.2d at 840.

. See error patent discussion, infra, regarding amendment of the indictment.

. On March 26, 2008, this Court sent notice of defendant’s appeal to the Louisiana Attorney General in compliance with La. R.S. 13:4448. See State v. Hines, 07-312, p. 2 (La.App. 5 Cir. 10/30/07), 970 So.2d 1134, 1135 n. 2.

. In so quoting, defendant has not stated the holding of Apprendi, but instead quotes from the "historical foundation” for principles discussed therein. Apprendi, supra. Defendant also fails to note that the Apprendi quotation is itself a quotation of Blackstone’s Commentaries on the Laws of England.

. Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) and Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

. State v. Dorthey, 623 So.2d 1276 (La.1993).

. In State v. Pilcher, 27,085 (La.App. 2 Cir. 5/10/95), 655 So.2d 636, writ denied, 95-1481 (La.11/13/95), 662 So.2d 466, the Second Circuit affirmed the imposition of two consecutive life-without-benefits sentences for a 15-year-old defendant convicted of two counts of second degree murder.

. Although Dorthey was decided relative to downward departures from mandatory sentences under the Habitual Offender Law, the Louisiana Supreme Court has held that sentencing review for downward departures apply to all sentencing laws and is not limited to mandatory sentences under the Habitual Offender Laws. See State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274, 1275 (per curiam).

. See, discussion of Roper, supra at fin. 1.

. This defendant has unsuccessfully raised this claim in an unrelated case. State v. Jacobs, 04-1219, pp. 13-14 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, 91-92, writ denied, 05-2072 (La.4/28/06), 927 So.2d 282, cert. denied, 549 U.S. 956, 127 S.Ct. 385, 166 L.Ed.2d 276 276 (2006).

. The citation to Kent and the relevance of the Eighth Amendment to the determination of jurisdiction in this case is enigmatic.

. The Louisiana Supreme Court denied defendant’s writ application on this issue, but on different grounds. State v. Jacobs, 04-2738 (La.6/17/05), 904 So.2d 712.

. See Error Patent, infra, for further analysis of the indictment in this case.

. In the instant case, defendant did not challenge the sufficiency of the amended indictment by way of a motion to quash under La.C.Cr.P. arts. 531-532; nor did he raise the issue in his original appellate brief.

. We note that the September 12, 2002 indictment is in the appellate record. (Vol. 1, p. 162).